LANCASTER DISTRICT, MAY TERM 1832.

Watts.
1 w 9
154 321

Watts.
1 w 9
157 461
1 w 9
178 251

Watts
1 W 9
206 ¹632

1 W 9
34 SC 600

## Kerper *against* Hoch.

The fourth section of the act of 4th April 1797, which provides that no debts of a decedent, unless they be secured by mortgage, judgment, recognizance or other record, shall remain a lien on lands and tenements longer than seven years after the decease of such debtor, unless suit be brought within seven years, or a statement of the debt be filed in the prothonotary's office, is a statute of limitation and repose, and protects not only *bona fide purchasers*, but *heirs* and *devisees* and those claiming under them.

Where nearly *nine* years after the death of intestate, suit was brought and judgment had against his estate, it was held that the person so obtaining judgment could not come in upon any portion of the parcels of land taken by the intestate's son under a writ of partition and valuation of the real estate of his father, and sold by virtue of judgments against the son, neither as against the creditor of the son, nor the son himself.

ERROR to the court of common pleas of *Berks* county.

IN this case, *Jacob Gosler*, whose father died intestate, had taken certain parts of the real estate of the intestate, Nos. 1, 4 and 6, according to a partition and valuation which had been made of it, under a writ issued for that purpose out of the orphan's court of Berks county; and had entered into recognizance, to pay to the widow of the deceased the interest annually upon one third of the valuation money during her life, and to pay to the other children, four in number, their respective portions of two thirds of the valuation, in one year, with interest; and their proportion of the re-

B

·[Kerper v. Hoch.]

maining third upon the death of the widow.    He also, at the same
time,  gave  his  bonds  to  them  for  the  payment  of  the  first  two
thirds,  which  were  to  be  paid  with  interest  in  one  year.    The
father  died  on  the  24th  of  January  1816.    The  lands  taken  by
*Jacob*  were  decreed  to  him  by  the  orphan's  court  on  the  7th  day  of
January 1817·; and on the 10th of the same month, he entered into
the recognizance and gave his bonds.

A  suit  was  brought  against  *Jacob*,  upon  his  recognizance,  in  the
court  of  common  pleas  of  Berks  county,  to  August  term  1822;  and
on  the  12th  of  August  1822,  judgment  was  obtained  against  him,  in
favour  of  the  other  children  and  heirs  of  his  father,  for  the  balance
unpaid  to  them  of  their  respective  portions  of  the  first  two  thirds  of
the  valuation  money.    On  the  25th  of  March  1823,  *Jacob*  had  paid
off  all  the  bonds  given,  with  the  exception  of  the  one  which  he  had
given  to  his  brother  *John;*  upon  which  there  remained  a  balance
due  of  about  650  dollars,  which  *John*  on  that  day,  for  a  valuable
consideration, assigned to *Joseph Hoch*, the defendant in error.

At  November  term  1820  of  the  court  of  common  pleas  of  Berks
county,  *Jacob Gossler*  confessed  a  judgment  to  *John V. Epler*,  for  a
penalty  of  2000  dollars,  to  secure  a  debt  which  he  owed  to  him ;
and  on  the  11th  of  November  1822,  in  the  same  court,  *Peter Roder-
mel*,  another  creditor  of  *Jacob Gossler*,  obtained  a  judgment  against
him  for  546  dollars  and  10  cents,  upon  which  an  alias  *fieri facias*  was
issued  to  April  term  1824,  and  the  parts  Nos.  1  and  6  of  the  estate,
late  of  the  father  of  *Jacob Gossler*,  which  had  been  decreed  to  *Jacob*
by  the  orphan's  court,  were  levied  on  as  the  estate  of  *Jacob*,  and  con-
demned ;  and  under  a  writ  of  *venditioni exponas*,  issued  to  August
term  1824,  both  parts  were  sold  to  *Elizabeth Gossler*,  the  widow ;
No.  1  at  681  dollars,  and  No.  6  at  6  dollars,  subject  to  her  annuity.
The  money  arising  from  these  sales  was  paid  by  her  to  *Daniel Ker-
per*,  the  sheriff  and  plaintiff  in  error,  who  still  holds  it  to  pay  *Conrad
Shep*, a creditor of the deceased.

In  the  common  pleas  of  Berks  county,  to  November  term  1824,  a
suit  was  brought  against  the  administrators  of  the  father  of  *Jacob
Gossler*,  upon  a  bond  given  by  him  to  *Conrad Shep*,  dated  the  27th
day  of  May  1813,  in  the  sum  of  200  pounds,  conditioned  for  the  pay-
ment  of  100  pounds  three  years  after  its  date,  and  on  the  8th  of
November  1824,  judgment  was  rendered  in  favour  of  *Conrad Shep*,
for the amount of the bond.

Upon  this  statement  of  facts,  contained  in  a  case  stated,  and  agreed
to  be  considered  in  the  nature  of  a  special  verdict,  the  court  below
rendered a ·judgment in favour of *Joseph Hoch*, who was the plaintiff
there, against the plaintiff in error.

The following errors were assigned.

1.  By  acts  of  intestacy  before  the  4th  of  April  1797,  the  debts  of
testators and intestates were charges on their real estates indefinitely.

2.  The  change  made  by  the  act  of  the  4th  of  April  1797,  was  in
favour of *bona fide* purchasers only, and does not embrace creditors.

[Kerper v. Hoch.]

3. *Jacob Gossler*, under whom the plaintiff in error claims for the use of *Conrad Shep*, took the land in question ·as heir, and not as purchaser, and as he held it under the charge and liable to the debts of his father, the plaintiff claims under said *Gossler* and stands in his shoes.

*Hopkins*, for the plaintiff in error.

Creditors have a lien on the real estate of a decedent, against his heirs or devisees. In *Graff* v. *Smith's Administrators*, 1 *Dall.* 482, a creditor took the real estate out of the hands of the alienee of the heir. *Jacob Gossler* is a volunteer, whose claim to the land is subject to the intestate's just debts. His recognizance was to pay *heirs*, in whose hands this land was liable for the debts, and this condition of the estate which existed at the time of the appraisement, continued afterwards when in *Jacob's* possession. For it cannot be, that mere volunteers, by hurrying through a partition and valuation of an intestate's estate, can affect injuriously the rights of the creditors of the estate : and *Jacob*, who took the land at the valuation, had no other nor higher character in respect to the shares of his brothers and sisters than they had, but as to these shares is a mere volunteer. Judgment, therefore, against *Jacob Gossler*, should not be paid out of the assets of his father's estate, but as subordinate to the claims against the estate. The act of 4th April 1797, relates to *bona fide* purchasers, and to them alone ; persons claiming under heirs or devisees are not entitled to the benefit of it. The assignee of a chose in action stands in the place of the assignor. So *Hoch* stands in the situation of *John Gossler*, of whose state and condition he had full notice by the recognizance. Besides, the statute is meant to protect the *bona fide* purchasers of real estate, not the assignees of *choses in action*. There is no limitation as respects the *proceeds* of real estate : *real estate* alone is mentioned. It cannot be endured, that heirs should enjoy the estates of their ancestors clear of the incumbrance of their debts : their rights must be subject to those of creditors. The judgment creditors of *Jacob Gossler* must claim, subject to the creditors of his father's estate, because their liens are upon the interest of the son alone, and the act of assembly protects purchasers only, and not judgment creditors. If we find the fund in the hands of children, we should be entitled to be paid. So if claimed by a transfer of their right to the money. Independent of the act of 4th April 1797, the lien of a debt against the estate of a decedent, is indefinite in duration ; and no change in regard to this case is made by it. In *Bruch* v. *Lantz*, 2 *Rawle* 392, it was held, that an executor who buys under a power to sell, at his own sale, was not protected by the act of 1797.

*Baird*, for the defendant in error.

An heir taking property at the appraisement, and paying the purparts of the other heirs, is a purchaser of such real estate. 6 *Serg. & Rawle* 257 ; 8 *Serg. & Rawle* 167, 181. Here *Jacob Gossler* bought five-sixths of the property, and for one-sixth only paid nothing.

[Kerper v. Hoch.]

The sheriff sold his estate, and not that of his father. If a sale had been made under an execution against the father's administrator, not more than one-sixth could have passed ; and even as to that sixth, the debts of the intestate could not be thrown on it exclusively.

The act of assembly protects not only purchasers, but also judgment creditors of the heir who takes the property at the appraisement. The act is an act of limitation, and is general in its terms. Will it be contended, that from the words of the preamble, none but *bona fide* purchasers are protected ? The words are similar to the preamble to the law, limiting the lien of judgment to five years, yet the supreme court decided that judgment creditors were within the purview of the act, as well as purchasers. *Bank of North America* v. *Fitzsimmons*, 3 *Binn*. 342 ; 11 *Serg. & Rawle* 94, 97. The case of *Bruch* v. *Lantz*, 2 *Rawle* 392, does not stand in the way of this construction. The point there decided was, that the sale by an executor to himself under a power in the will, did not constitute him a *bona fide* purchaser. But if it were against equity in *Jacob Gossler* to insist on the limitation, the conscience of *Joseph Hoch* is not affected, and he may insist on it. By becoming a purchaser of one of the heirs' shares, *Jacob Hoch* comes within the purview and protection of the act. Nothing but record liens bind property. 7 *Serg. & Rawle* 64, 80. An equitable lien does not come in. *Ibid.* The policy of the law is to enforce strictly these limitations. *Ibid.* 74. There is a statute in Massachusetts limiting suits against executors and administrators to four years from the death of testator or intestate. Courts say, that this statute is for the benefit of the estates, and those interested in them. A promise there by executor after four years, will not take the case out of the statute. 13 *Mass.* 201. Nor can the executor waive the bar. 16 *Mass.* 429. Even where he had suffered judgment to go by default, his sureties were allowed to plead the statute. 15 *Mass.* 6. So where executor himself paid the debts, he cannot after four years obtain an order of sale, unless estate remain *in statu quo* without partition. 15 *Mass.* 58. Reason of this strictness. *Ibid.* 143. It is the policy of the law, that estates of intestates should be settled. Heirs are not prohibited from applying immediately after the death of intestate, for a partition and appraisement. It is true, they are not protected from the debts of the decedent until after the lapse of seven years ; but is it not right that they should be protected after that period ?

*Hopkins*, in reply.

It would lead to great difficulty to give to purchasers from the heirs the protection of the statute. The husband, in the case in 6 *Serg. & Rawle* 267, is a purchaser, but does he purchase discharged from liens ? In the orphan's court frequent distributions are made of intestates' estates, and in each stage the debts of decedent are paid. Unless this case prevail, the legislature must interfere and prevent the estate being taken within a certain time. The law exists

[Kerper v. Hoch.]

against the entire estate, not against the one sixth : each heir is bound to contribute towards payment ; and a creditor of the estate is not bound by the transactions of the heirs among themselves. We have no statute like the one in Massachusetts, and the construction given to it can have no influence in the act under consideration. The case in *Serg. & Rawle* relates to parol liens : ours is so interwoven with the title that it cannot be separated.

The opinion of the Court was delivered by

KENNEDY, J.—Three errors have been assigned. There is, however, but one question involved in the case, and upon that the cause has been argued by the counsel. Does the fourth section of the act of 4th April 1797, entitled an act supplementary to the act directing the descent of intestate's real estate, &c., discharge the lands of deceased persons from liability to the payment of their debts after a lapse of seven years from the death of the debtors, in case no suit is commenced, or act done as therein required, in order to continue such debts a lien upon the lands ? A proper solution of this question will decide this case.

In Pennsylvania, lands are liable as goods and chattels to be taken in execution and sold for the debts of the owner ; and for this reason it must necessarily be, that the holders and apparent owners of them will and do obtain credit, and are enabled to create debts upon the faith of their being considered the owners ; and immediately upon the death of a debtor his debts become a lien upon all his real estate : but the consideration just mentioned, that those who succeed to the possession and ownership of his lands will thereby gain a credit in the world, that without them they could not obtain, rendered it indispensably necessary to place this lien under certain regulations and limitations. Latent liens are not favoured, and have ever been discouraged with us, where lands have frequently changed their owners in almost as rapid succession as if they had been goods and chattels, or merchandise. This doctrine, and the policy of it, are very clearly illustrated, and most powerfully enforced in the case of *Kauffelt* and *Bower*, in 7 *Serg. & Rawle* 64. Great injustice as well as inconvenience must ever result from *secret* liens being permitted to continue without limitation under any circumstances whatever. If we restrict and confine the operation of the fourth section of the act of assembly of the 4th of April 1797, to *bona fide* purchasers for a valuable consideration of the lands of the deceased debtors, so as to protect them alone after the seven years, and not the heirs or devisees of the deceased, the consequences will be, that the creditors of heirs and devisees to the end of the chain after the seven years have gone by, and who may fairly be presumed to have given the credits upon the belief that the heirs and devisees who became their debtors were the absolute owners of the lands clear of incumbrances, as nothing was put upon record to apprise them of the contrary, will be defeated most unjustly of their claims, without the slightest degree of neglect on their part, or even any

[Kerper v. Hoch.]

thing that could be called imprudence.   If seven years is not to be a bar to a proceeding against the lands of deceased debtors, to obtain payment of the debts, where nothing was done within that period to continue the lien as required by the act; when will it be prudent to trust the heir or devisee, on account of his being the owner and possessor of lands by inheritance or last will? Yet, under such circumstances of ownership, it is impossible to deny him credit; he will obtain it on account of the lands which he so holds.   He may not know of the incumbrances himself, and therefore feels conscious that he is entitled to claim all the credit he asks.   Have not he and they with whom he dealt good reason to believe that all the debts of the ancestor or testator were paid, as there had been no suits commenced or statements of them filed in the prothonotary's office within the seven years.   It, however, turns out afterwards, that there are bond-debts in amount equal to the value of the lands still in existence, which remain unpaid, without any thing having been placed upon record as directed, to indicate their existence; and the heir has, in the meantime contracted debts equal in amount to the value of the lands, and then dies leaving them unpaid.   They become, immediately upon his death, liens upon the lands.   Now here are two sets of creditors, one of which must inevitably lose their debts; and which, upon principles of reason and common justice, ought it to be? If the question were to be decided upon this ground, those who are most free from blame ought to be preferred, and the law always does attach at least some degree of blame to negligence; and here I think it will be admitted, that negligence may well be imputed to the creditors of the ancestor, and that they have no right, therefore, to claim a preference.   The maxim of law on this subject is, *vigilantibus et non dormientibus leges subserviunt.*   They withheld from the public the means prescribed by the act for giving notice of their claims.   This was gross negligence upon their part.   They have thus indirectly encouraged the credits which were given to the heir of their debtor, and ought not, therefore, to be permitted to take away from those creditors the only fund out of which they can be paid.   If they had placed their claims against the ancestor upon record in the manner required by the act of assembly, within the seven years, it is fair to presume, that the credit which was extended to the heir would not have been given.   It is not material here, that no fraud was intended by them in their neglect to bring forward their claims as required by law; for the rule is, that if one of two innocent persons must suffer a loss of which one of them has been the occasion, it shall fall upon him who was the cause of it.

With respect to the fourth section of this act of the 4th of April 1797, it appears to me to be, to all intents and purposes, a statute of limitation and repose.   In the case of the *Bank of North America* v. *Fitzimons,* 3 *Binn.* 359, 360, it is very properly spoken of as a part of a system which the legislature of the state have, by a series of acts, introduced and gradually matured against long continued liens on

[Kerper v. Hoch.]

real estates, from which great inconveniences had been encountered and many evils had arisen. It is a mistake to suppose that a regulation which limits liens, especially secret liens, which exist only in the knowledge or pockets of certain individuals, upon lands, does or can impair the claims, or injure in the main the rights of creditors; so far from producing such an effect, it has been found, by experience, to afford security and protection. Under this impression, as the chief justice of this court has said, in the case of *Kauffelt* v. *Bower,* 7 *Serg. & Rawle* 78, " the legislature has uniformly discouraged every other lien or incumbrance than those which arise from transactions which *appear of record,* and which therefore can prejudice no one, who uses proper diligence to ascertain the state of the facts : and even when liens are permitted, it has been thought that the *state of property,* as well as the *habits of the people,* required them to be laid under *severe limitations* and restrictions. Thus, by act of assembly, a judgment continues a lien but for five years, unless within that period it be revived by *scire facias."* And I will add, that of this we have a most full confirmation by an act passed since that, in 1827, limiting still more strictly the liens of judgments. If the continuation of those liens without limitation, which grow out of matters of record, and are open to the inspection of every body, and can therefore be readily known by all, be deemed so serious an evil as to require the most guarded restrictions imaginable, how much greater must it be in the case of secret liens. As long as they are kept from being placed upon record, there are no means furnished of ascertaining their existence or amount. Hence no man can tell when he is safe from the effect of them, either directly or indirectly. If those who claim to have such debts were to put them on record, as required by the act of 1797, it would afford an opportunity of knowing them who claimed to have such debts ; so that every one interested might inquire and satisfy himself, and after that, govern himself accordingly. But is it not criminal in those who pretend to have those claims, to lie by without suing, or otherwise filing in the prothonotary's office a statement of them, where they are not payable within the seven years; in order to continue the lien and give notice of their claims, to attempt after that period has expired to take away the land for the payment of their debts, to the entire exclusion of the creditors of the heir who trusted him after the seven years had passed, upon the faith of his owning the land clear of incumbrances? To permit or sanction such a thing would, I think, be a direct violation of the act of 1797, and not only unjust, but culpable. It would be making the act a snare, to catch not merely the unwary, but such as the most cautious and vigilant could not always escape from.

It has been contended in this case, that the words of the preamble to the fourth section of the act of 1797 show, that the limitation, although expressed in general terms in the enacting part, was intended for the protecting of *bona fide* purchasers, and no others. There are certainly no negative words in this preamble, and the limi-

[Kerper v. Hoch ] ·

tation in the body being general and positive without the least qualification, the preamble, even if it were in its terms confined to purchasers, which I do not concede, ought not, without some other aid, to restrain and limit the general operation of the enacting clause. If purchasers were the only persons who could be injured by such secret liens being suffered to remain without limitation, there might be some reason for confining the enacting clause to purchasers, if they were the only objects presented in the preamble.    In the *Bank of North America* v. *Fitzsimons,* the same argument was offered to restrain the operation of the general terms employed in the enacting clauses of the act of 1798, limiting the lien of judgments to five years, unless revived by *scire facias* within that period.    The only mischief recited in the preamble of that act was, the risk and incon- venience that were produced to purchasers of real estate from judg- ments remaining a lien upon it for an indefinite length of time ; the court however decided, that the preamble was insufficient to contract the enacting clauses, and that the lien of judgments should cease to exist after a, lapse of five years, unless revived within that time against subsequent judgment creditors as well as purchasers.

The preamble to the fourth section of the act of the 4th of April 1797, is couched in the following words.    " Whereas inconveniences may arise from the debts of deceased persons remaining a lien on their lands and tenements, an indefinite period of time after their decease; whereby *bona fide* purchasers may be injured, and *titles become insecure.*"    It must be observed, that it is not the titles of the purchasers before mentioned that is here spoken of, more than the titles of any other persons, such as the *heirs* or *devisees* of the deceased debtors themselves, otherwise the words "*their* titles become insecure" would have been used.    These two clauses are not necessarily con- nected so as to render the latter inoperative without the first; but may be considered as substantive and independent.    The latter clause may be considered as referring to the insecurity that must attend the titles of the heirs or devisees of the deceased *debtors,* if the liens of their debts were suffered to continue beyond seven years from the deaths of such debtors, unless suits were commenced for them where they were payable within that time, or a statement of them filed in the office of the prothonotary of the county where the land might happen to lie, within the seven years from the deaths of the debtors, where they were not payable within that time.    So far as the generality of the enacting clause of the section may be calcu- lated to strengthen and support this construction, it is as full and ample as could be wished for.    It declares, in the most general and positive terms, that the debts of no deceased persons shall remain a lien on their lands longer than seven years from their deaths respect- ively, unless sued for, or a statement filed within that time as already mentioned.    Beside, all the arguments which were brought to bear in the case of the *Bank of North America* v. *Fitzsimons,* in support of giving to the enacting clause a construction co-extensive with

the generality of its terms, and sufficiently broad to embrace all the objects set forth in the preamble and enacting clauses taken together, come with double force here, where the liens intended to be limited are of a secret nature, not appearing upon record in any shape, and therefore of a much more dangerous as well as mischievous character.

Since the act of 1798, limiting the lien of judgments, was considered to extend to subsequent judgment creditors as well as purchasers, although purchasers alone were pointed out in the preamble as its objects, and this construction has since been expressly confirmed and approved of by the legislature, I think that we ought to observe the same latitude of construction of the fourth section of the act of 1797, which, in the preamble, as well as the enacting part, has terms sufficiently general, not merely to admit of, but to demand it, in order to guard against evils that otherwise would arise, of a more injurious and much more extensive nature. They are also parts of the same system of protection, and ought to receive such construction as will preserve the harmony and symmetry of it. This can only be done by giving, after the expiration of the seven years, a preference to the creditors of the heirs or devisees, over those of the ancestor or testator, who have slept and done nothing during that period to continue the lien of their claims. Now, with a view to apply this principle to the case before us and under our consideration, let us for a moment attend to the relative position of *Shep*, the creditor of the deceased ancestor, and *Hoch* and other creditors of *Jacob* the heir. The creditors of *Jacob* had sued him and obtained judgments against him for their debts, thereby clearly making them liens upon the land : and although the debt of *Conrad Shep*, the creditor of the deceased, became payable about the time of the death of the deceased, in January 1816, no suit was commenced for it until November term 1824, a space of nearly nine, instead of seven years ; and this too after the creditors of *Jacob* had all obtained their judgments. Thus the creditors of *Jacob* had liens for their claims respectively upon the land, at a time when the debt of the creditor of the ancestor had ceased to be a lien. If the lien of *Shep*, the creditor of the ancestor, was extinguished by the operation of the act of 1797, upon the land, his obtaining a judgment afterwards could, upon no principle that I can conceive of, revive it, or renew to him in any manner a right which he had lost by his own neglect. While things were in this state, *Peter Rodermel*, one of the creditors of *Jacob* the heir, issued a *fieri facias* upon his judgment, by virtue of which the land was taken in execution, condemned, and afterwards sold by the sheriff, upon a *venditioni exponas*, issued for that purpose, as the estate of *Jacob* the heir, and the purchase money paid into the hands of the sheriff. And although *Shep* obtained a judgment for his debt against the personal representatives of the deceased ancestor, he never issued an execution upon it.

It is admitted, that the purchaser at the sheriff's sale will hold the

c

land discharged from *Shep's* judgment, but *Shep* claims to be paid first out of the money arising from the sale which is in the hands of the sheriff. Upon the same principle, that it is admitted that the purchaser at sheriff's sale will hold the land discharged from the debts of the deceased, that is, as a *bona fide* purchaser of the land, which is within the express provision of the act; it must also be admitted, that *Jacob*, the son, held his brother and sister's shares of the land, which was seven eighths of the whole, discharged from the same debts after the seven years had elapsed; for it cannot be gainsaid that he was a like purchaser of at least their portions in the land. This would necessarily limit *Shep's* claim, if not excluded altogether, to be paid out of that portion of the land which it may be said that *Jacob*, the son, held by descent, and not by purchase; to wit, one eighth part only. But the land was levied on and sold at the suit of the creditor of *Jacob*, the son, and as his estate. And can it be denied that he was the owner of it? Certainly not. The money thus made from the sale is to be appropriated to the discharge of the debts, which were liens upon the land at the time of the sale, according to their seniority. This I consider to be a well settled and established rule, without any exception, unless in the case of purchase money due to the commonwealth for the land, or in the case of mortgages falling within the provisions of the act of 1730. If *Shep*, then, had lost his lien upon the land for the payment of his debt at the time of the sale by the sheriff, I cannot imagine any principle known to the law upon which he can claim it out of the money; and without an entire disregard of the express terms and provisions of the act of 1797, it must be considered, that his lien upon the land was gone, and that the sheriff cannot withhold the money from the judgment creditors of *Jacob*, the heir, on that account.

This would be sufficient to affirm the judgment in this case, without deciding upon the effect of the limitation as respects the *titles* of the heirs and devisees to the lands which have descended and passed to them from the deceased debtors, after the seven years have run without suits being commenced, or statements of the debts being filed within that time, in conformity to the act, whether such heirs and devisees shall hold the lands discharged from the debts, where there are no creditors of the heirs and devisees to be injured by the debts of the ancestor or testator being paid out of them. Having protected the creditors of the heirs and devisees, I am not only willing, but feel myself bound by the provisions of the act, and what has been most indubitably the policy of the state, to extend the benefit of the limitation to the heirs and devisees, in order to make them secure in their titles. If such be not the true construction, a state of things must often arise that the legislature intended to provide against, and which would have required their direction, if it had not been thought at the time, that their act would in future prevent it.

In the first place I have to observe, that it has ever been the policy

[Kerper v. Hoch.]

of the state to encourage as much as possible the settlement and cultivation of all her lands, and to hold out every inducement that could be offered, to bring about rapidly the highest state of improvement in every point of view that could be imagined, not merely in changing the country from a wilderness into fine cultivated farms, and to put up permanent and commodious dwellings and other buildings upon them, but to encourage the building of cities, towns and villages, as also the establishment of manufactories in all favourable situations, and at the same time to embark herself in the making of canals, rail and turnpike roads to the fullest extent of her resources. But we all know, that unless the holders of lands are made secure in their titles, it is in vain that all other inducements are held forth to encourage them to improve them for almost any valuable purpose whatever. Partly with this view it is, that twenty-one years' adverse possession without even the shadow of right or title, will give a good title to lands by the policy of our law, to one who acquired his possession by an outrageous and forcible expulsion of the true owner, even where the title of the owner was upon record, and the ejector presumed to know all about it. How much more reasonable and just is it then, that the heir or devisee of land who has succeeded to the possession and ownership of it under the authority and sanction of law, and not in forcible violation of it, and who is in no wise to blame, should be protected against those claims which have slept and been kept secret for the space of seven years, that he may not only enjoy it in peace and safety, but that he may go on and improve it, for either agricultural, manufacturing or trading purposes, and thus advance the great interests of the state, as well as his own?

As it respects the rights and the security of the creditors of the deceased, I would ask, is not seven years time enough in all reason for them to prosecute their claims by suit, if payable within that time; if not, is it not sufficient time to file a statement in conformity to the act? All will join, I think, in answering in the affirmative. If a creditor will not observe the course pointed out by the act, and thereby loses the chance of recovering his debt, he has no reason to complain of the law; the fault, if any, was entirely his own.

I will again turn for a moment to what must often be the situation of heirs and devisees, if protection be not afforded them by this act Suppose that the lands, at the time that they come to the possession of them, were of little value, being rough, mountainous, unimproved lands, and have been made highly valuable by them in the construction of works, and extensive and costly buildings for the manufacturing of iron; are they to be made liable in this highly improved state, when the seven years have elapsed without any thing being done by the creditors, as required by the act, to secure the payment of their debts? Surely not. But if it be said, that the lands may be taken in execution and sold, and that the heirs or devisees shall be first paid out of the money arising from the sale made by the sheriff: But I ask, how is the value of the improvements to be ascertained; and

when ; before or after the sale.   If before, by what authority ; and where has the law pointed out a course to be pursued to effect this, that shall be binding on all concerned ?   If after the sale, then I have no hesitation in declaring, that the property and the rights of the heirs or devisees must be most wantonly sacrificed in many instances without producing any thing for the creditors of the deceased ; because, in nine cases out of ten, of such land so improved being sold by the sheriff for cash in hand, as it must be—it would not bring near, perhaps not one half of the value of the improvements, and hence the result must be loss and ruin to all concerned.   It may, therefore, be fairly inferred, that the legislature intended, by the act, to protect heirs and devisees, as well as *bona fide* purchasers, otherwise they would have made some provision to obviate the difficulties and to prevent the sacrifices alluded to.

Again, if heirs and devisees be not considered as coming under the protection of the act, some of the inevitable consequences will be, that the elder branches of them, and those of full age, will sell out before, or immediately after the expiration of seven years, and leave the younger branches who are minors, helpless and incapable of either selling, or maintaining themselves, to be stripped of all that has descended or been given to them, by its being taken from them to pay the debts of the deceased, which have made their appearance after that the seven years have run.   Thus the whole burthen of paying these debts is thrown upon the estates of helpless minors, while those, possibly of less merit, and generally more able to bear it, go clear.   For I consider it settled in this state, that heirs or devisees who have sold and parted with the real estate or lands which come to them by descent or devise, and who of course have nothing of the deceased's estate remaining specifically in their hands or possession, cannot be sued for the debts of the deceased by his creditors.   They must pursue the property : but if, that being in the hands of *bona fide* purchasers, it is discharged from their claims by the provisions of the act, I hold, that the heirs or devisees are discharged from all responsibility likewise, and that they will not be bound to make contribution to their co-heirs or devisees whose interests in the estate were taken and sold after the expiration of the seven years, and after the interests of those who had sold out were discharged by the operation of the act.   They no longer stand *in æquali jure.*   The debts were no longer a lien or burthen upon their rights or interests, and the estates of the minors were not taken to discharge them or their estates from claims that had an existence against either.   Can it then be believed that the legislature intended to place minors in a worse situation, in respect to their patrimony, than those of full age ?   I think not.   It would also have a tendency to deprive heirs and devisees of the full benefits and value of the estate, because, without limitation to protect them in the enjoyment of it, they would have no security for it that they could rely on with confidence, and would therefore seek the earliest opportunity of parting with it, and often do it at a great

[Kerper v. Hoch.]

sacrifice rather than run the risk of losing it altogether, and their improvements along with it, if they have been so imprudent as to make any.

The case of *Bruch* v. *Lantz*, 2 *Rawle* 392, has been relied upon as an authority by the counsel in favour of the plaintiff in this case. The decision in that case was not concurred in by all the members of the court, and was connected with some circumstances of fraud, upon which some of the members thought the cause turned pretty much. I have examined the report of it, and must confess, that the principle decided in it does appear to me to support very strongly the side of the plaintiff in error here, and under that impression I supposed that I might be mistaken with respect to what struck me as the true construction of the act of 1797. I, therefore, with a disposition to sustain it if I could, although not the decision of a full court, nor yet of all the members of it who heard the arguments, gave it a very careful examination, and regret that I cannot yield my assent to it. It is with great reluctance, too, that I withhold my assent from a decision of this court; and nothing but a conscientious conviction that there is error in it could induce me to depart from it, nor even then would I do so were I satisfied that it had become a rule of property ; for I am aware of the advantages that are to be derived from the certainty of the law, and that nothing does contribute more to it than uniformity in the decisions of the courts.

Judgment affirmed.