# Clauser's Estate.

An administrator may not be permitted to settle an account in the Orphans' Court, for the mere purpose of charging the estate with a debt due to himself by the intestate in his lifetime.

An administrator having a debt by bonds against the estate of his intestate, is not exempt from the requisitions of the 4th section of the Act of 1797, to file a copy or written statement thereof, in the office of the prothonotary, within seven years after the decease of the *debtor ;* and if he neglect to do so, the lien of the debt is gone, and he cannot afterwards charge the real estate with its payment.

APPEAL from the decree of the Orphans' Court of *Berks* county, quashing the account of Peter Sheradin, administrator of Peter Clauser deceased.

Peter Clauser died in 1823, intestate, and letters of administra-

[Clauser's Estate.]

tion issued to Peter Sheradin, who settled his account in the Orphans' Court in 1826, in which he charges himself with the inventory, and credits payments, leaving a balance of $370 in the hands of the accountant. In 1830 he settled a second account, in which he charges himself with the balance on the first account and other sums, amounting to $2354.89, and prays credits for disbursements (and, among others, one bond of $266.66 of the series hereafter mentioned) leaving a balance in his hands of $545.14.

The accountant, on the 13th of November 1839, rendered his third account, in which he charged himself with balance reported by auditors, November 13th, 1830, as due by him on his second account, to wit:    $538 68

The accountant craved credit for disbursements made by him since former account, and with sums due, and to become due to him, as follows:

1830.    Nov. 8.    Cash paid guardian of deceased's minor children . . . . . . . . . . . . .    $439 25
1831.    June 3.    do    do    do    do    105 89

By the following bonds executed by intestate to the accountant, all dated January 1, 1822, and payable as follows: to wit, (being the residue of 24 bonds, and thus numbered.)

| No. 17—Bond in 200*l.*, conditioned for 100*l.*, April 1, 1838, deducting $164.60 paid April 1, 1839, then due | $118 07 |
| " 18 . . . . . " . . . . 100*l.* . . . " . | 266 67 |
| " 19 . . . . . " . . . . 100*l.* . . 1840 | 266 66 |
| " 20 . . . . . " . . . . 100*l.* . . 1841 | 266 66 |
| " 21 . . . . . " . . . . 100*l.* . . 1842 | 266 67 |
| " 22 . . . . . " . . . . 100*l.* . . 1843 | 266 67 |
| " 23 . . . . . " . . . . 100*l.* . . 1844 | 266 66 |
| " 24 . . . . . " . . . . 66*l.* 2*s.* 6*d.* 1845 | 176 33 |
| Interest due on bond No. 17 . . . . . . . . | 4 36 |
| Do    do    No. 18 . . . . . . . | 9 86 |
| Fees paid Register, &c. . . . . . . . | 8 00 |
| Stating account . . . . . . . . . . | 5 00 |
| Commission to accountant . . . . . . . . | 10 00 |
| | $2476 74 |

Dr.    $538.68
Cr. Due this day,    428.41
" To become due    1509.65
    —————
    $2467.74

1840.    The account was presented to the Orphans' Court,
January 10.    and they appointed Dennis O'Brien, Andrew Sallade, Franklin B. Schoener, Esquires, auditors, who on the 8th April, 1840, reported the account as cor-

I. — 27    s *

rect, giving accountant credit for expenses of audit, viz. $33.50, and making the balance then due accountant to be . . . . . . . . $738.37

To become due as per credit side of acc't 1242.98

$1981.35

1841 Ap'l 10. Report of auditors was read and confirmed nisi:

Aug. 7. Mr. Strong filed the following exceptions:

1. The auditors erred in allowing accountant credit for the sums $439.25 105.89 118.07 266.67 266.66 266.67 266.67 266.67 266.66 176.33 4.36 9.86 8.00 5.00 and commission 10.00.

2. Auditors erred in not charging accountant interest.

The following testimony was taken on behalf of the accountant: October 23, 1830, before William A. Wells, Esq., according to rule:

John Weidenhammer being produced and sworn, (the attorney for the exceptant objects to the witness, he being guardian for one of the minor children,) deposeth and saith that he is acquainted with the handwriting of George Kemp; from his knowledge of the handwriting, he believes that the name of George Kemp to the attestation of bonds by Peter Clauser to Peter Sheradin, marked A. B. C. D. E. F. G. & H., is the handwriting of said George Kemp, and that the said George Kemp is deceased, and. George Kemp, Junior, the other subscribing witness to said bonds, is also dead. Witness says that the name of John Weidenhammer as a witness to agreement, dated 18th December, 1839, and marked I., is deponent's handwriting, and that he saw the parties to that agreement execute the same.

Witness says that when Peter Clauser died, Peter Sheradin hired a man to work the farm of said Peter Clauser, in Richmond township, Berks county, for four or five years, and that the widow and children of said Peter Clauser continued to live on the place during that time, and that William Clauser, the tenant, lived also on the place.

Then the old man, Peter Sheradin, gave up the place, and administered to the estate of Peter Clauser. Then the administrator made vendue of the personal property, and I was appointed guardian of Catharine and Peter Clauser, two of the minor children of said deceased, and Samuel Fegely was appointed guardian of William and Maria, and Elizabeth, the other child of the deceased, was married to Matthias Roth. The widow of Peter Clauser, deceased, is a daughter of Peter Sheradin. When we were appointed guardians, we leased the property—I asked Peter Sheradin how many bonds he had against the estate, he said seventeen. We had no agreement about the bonds, but every spring what was left after paying the expenses of the farm, was paid on the bonds as they fell due, from 1829 or '30 until last

[Clauser's Estate.]

spring, when we paid nothing. The old man wanted us to try and keep the place until the eldest son had his age, that he might have a chance of taking it. It was my meaning that the place should be kept until the eldest son should attain his age, and so we have done until this time. The property is now under lease. The farm of Peter Clauser, at the time of his death, was not worth near as much as it is now. During the time that Peter Sheradin farmed the property after the death of Peter Clauser, he managed it as well as if it had been his own, and he managed it well.

Cross-examined.—Witness says Peter Clauser died the 16th of May 1823.

Samuel Fegely being produced and sworn, (the attorney for the exceptant objecting to the witness, he being guardian for some of the minor children) deposeth and saith, that there was no understanding regarding the payment of the bonds. From the time we were appointed guardians we rented the property every year. When the first rent was due, old Sheradin demanded a bond. We paid every spring one bond until John Ressler, who married the widow of Peter Clauser, had the land appraised. We paid the bonds out of the rent. We settled with Ressler, and paid him $412.

To the best of my recollection, Mrs. Ressler moved away from the property the spring of 1828 or '29. Peter Sheradin farmed the place after the death of Peter Clauser—Peter Sheradin always said to me that he wished us to keep the farm until the eldest son attained his age. And so we have done until this time; he will not attain his age, so it is said, until next harvest; eight or nine bonds have been paid off, each of £100; as they were paid they were delivered to me and I have them in my possession. Mr Sheradin was present at the time of the agreement between Ressler and wife, myself and Weidenhammer as guardians, and Matthias Roth, and he was satisfied that we should do so. The rents fell short, so that we were unable to pay the bonds as they fell due, and we are behind now.

Letters of administration upon the estate of Peter Clauser were granted to Peter Sheradin May 26th 1825.

Translation of an agreement of 8th of November 1830, referred to in Fegely's deposition.

The following articles were concluded on the 8th day of November 1830, between John Ressler and Judith, his wife, late the widow of Peter Clauser, deceased, of Richmond township, Berks county, in the state of Pennsylvania, of the one part, and John Weidenhammer, guardian of Peter and Catharine, Samuel Fegely, guardian of William and Maria, Matthias Roth for his wife Elizabeth, all children and heirs of the estate late of the deceased Peter Clauser, of the same place, of the other part, to wit:

In consideration of the hereinafter mentioned sum, the said

[Clauser's Estate.]

John Ressler and his wife Judith agree and promise herewith for themselves, their heirs, executors and administrators, to give up the third part of the personal and real property to which the aforesaid Judith as widow is entitled, according to the laws of the land, all the demands that they have for the time of eleven years beginning with the first day of April next, and ending with the first day of April 1842, when the said John Ressler and his wife Judith shall be again entitled to demand the interest of the third part as her dower, according to the laws of the land, out of the real estate of the deceased Peter Clauser. In pursuance of this agreement, the aforesaid guardians, to wit, John Weidenhammer, Samuel Fegely and Matthias Roth for themselves, their heirs, executors and administrators, as guardians of the abovenamed children and heirs of the aforesaid Peter Clauser deceased, agree and promise for eleven years to come, *and* their share of the personal goods to pay the sum of four hundred and five dollars, good and current money of the state of Pennsylvania, on the first day of April 1831, to the aforesaid John Ressler, or his order ; which in regard to the said eleven years is as interest of her dower out of the real estate and the third part of the personal estate of the said Peter Clauser, in full for the said eleven years, and after the end of the said eleven years, the said Ressler and his wife Judith shall again be entitled to the aforesaid dower out of the real estate as the laws prescribe, and this agreement shall be null and void ; still the third part of the personal estate is settled in full and received with the above sum, and for the true performance of all the abovementioned articles each of the said parties bind themselves, their heirs, executors, and administrators and assigns, to the other party his heirs, executors administrators and assigns, in the penal sum of eight hundred dollars, Pennsylvania money. In testimony whereof, &c.

Signed and sealed by the parties in the presence of Peter Sheradin and John Wanner, subscribing witnesses.

Translation of agreement proved by John Weidenhammer, and marked I.

Articles of agreement dated 18th of December, A. D. 1839, between Matthias Roth, his wife Elizabeth, late Elizabeth Clauser, William Mertz, his wife Maria, late Maria Clauser, and Catharine Clauser, all children and legal heirs of Peter Clauser deceased, late of Richmond township, Berks county, of the one part, and Peter Sheradin, of Maxatawny township, in said Berks county, administrator of the estate of the aforesaid Peter Clauser deceased, of the other part, have been agreed upon in the following manner, to wit :

We, the abovenamed heirs of the said Peter Clauser, promise hereby for ourselves, our heirs, executors and administrators, that we are satisfied our proportion of the following bonds which our father Peter Clauser in his lifetime put out to the said Peter

[Clauser's Estate.]

Sheradin, and which are not yet paid, some due and some to become due—namely, one bond dated January the 1st A. D. 1822, for the payment of £100, April 1st 1838, on which bond on last first day of April were paid $165.60; then follow yet six bonds, all dated January 1st 1822, for the payment of £100 annually on the 1st of April, to wit: April 1st 1839, 1840, 1841, 1842, 1843, 1844, each bond for £100, and one bond also dated January 1st 1822, for £66 2s. 6d., on the 1st day of April A. D. 1845. Of the above bonds we promise to pay our proportions as heirs of the said Peter Clauser, or to allow them to be deducted from the rent or income of the real estate of Peter Clauser deceased; if, however, the said real estate should be appraised and accepted in the Orphans' Court of Berks county, by us or any of the said Peter Clauser's heirs, as the laws prescribe, then we are content the three or our three parts to allow to be deducted what comes upon us to pay the said bonds to the said Peter Sheradin or to his heirs, executors and administrators; if, however, the land should not be accepted, or a part thereof be accepted, and part sold, then we are content to bear our proportion of the said debt, and it shall be kept back out of the purchase money when it is paid on the bonds by the purchaser or the acceptor or acceptors. In consideration of the abovementioned, Peter Sheradin, for himself, his heirs, executors and administrators or assigns, promises that the abovenamed three children and heirs of the said Peter Clauser deceased, shall pay no costs that I make or that shall be made to recover the money for the abovementioned bonds from the remaining heirs of the said Peter Clauser by process, or in any other manner or way; and for the true performance of this agreement, and every article thereof, each of the abovenamed parties bind themselves, their heirs, executors, administrators and assigns, to the other party, their heirs, executors, administrators and assigns herewith. Witness our hands and seals.

Signed and sealed by the parties in the presence of John Weidenhammer and Samuel Hoch.

On argument upon the exceptions filed, the court below quashed the report of the auditors and the account filed.

*Davis* and *Smith*, for appellant, argued that the second account settled in 1830 was not a final settlement of the estate: the administrator there credited himself with one bond of the series, being the only one then due; he could not credit the others at their cash value, for they were not due. And he makes such arrangement regarding them as seems to him best to promote the interests of the heirs. But what has the Act of Limitation to do with a case like this? The design of that law was to give notice of debts due by the estate. Notice to whom? to creditors? In this case there are none to be affected by want of notice. To the heirs? Why certainly they had notice, for their guardians and the husband of

the widow entered into agreements respecting the time and manner of their payment. 8 *Serg. & Rawle* 35; 5 *Watts* 548; 6 *Watts* 42.

*Strong*, for appellee. This case is clearly within the principle settled in 5 *Watts* 84; and the accountant accomplished no purpose by the settlement of the account, but the assertion of a debt due to himself.

But is not the claim gone by lapse of time? There is no reason why an executor or administrator should be exempt from the requisitions of the Act of 1797. He may file a written statement of his claim. It is not a question of notice or of knowledge, but the positive requisition of a statute, and the knowledge of the heirs will not alter the rule. 6 *Watts* 22. The agreement referred to is signed by only a part of the heirs, and does not contemplate any provision for keeping alive the lien of these bonds. After the lapse of seven years the Orphans' Court will not grant an order of sale of lands. 8 *Watts* 253; 5 *Pick.* 140. The administrator in this case, then, will not be permitted to get at a sale of the real estate by this indirect mode.

The opinion of the Court was delivered by

ROGERS, J.—An executor will not be permitted to settle an account in the Orphans' Court, for the mere purpose of charging the estate with the debts due to himself by the testator, in his lifetime. *Shenck's Administration Account*, (5 *Watts* 84.) In that case, no assets had ever come to the hands of the executor, but in his account he charged himself with the amount of the inventory, and prayed a credit for it, as having gone into the hands of his co-executor. The argument was, that he was at liberty to pursue this course, because, never having had any assets in his hands, he could not retain the amount of his debt, so that in that aspect, this case is less favourable to the right claimed by the administrator. For although his debts were not due at the time he made his settlement, yet there was nothing to prevent his bringing them into the account, and retaining an amount of the assets sufficient to satisfy them. When an administrator has fully settled his account, he is not entitled to exhibit another account, unless he is in possession of assets not already accounted for, or is out of pocket for disbursements in his office. 5 *Watts* 84. The accountant having failed to bring himself within either category, comes within the decision cited. The administrator settled his accounts, the last of which purported to be a final account, in which he acknowledges he has in his hands for distribution, $538.65. Although no formal decree of the court is made, yet, according to our practice, we must take it as if it was made. Why the accountant omitted to charge the estate with debts owing to him, does not distinctly appear; although it may have arisen from a mistaken

[Clauser's Estate.]

apprehension that they could not be charged in the account until they were due. But from whatever cause it arose, as he has slipped his opportunity, he cannot retrace his steps in the mode which he has adopted. And we come to this conclusion with less reluctance, because the party is not without remedy by petition for review, in the manner pointed out in the Act of the 13th of October 1840. The 4th section of the Act of the 29th of March 1832, has been relied on, which gives jurisdiction to the Orphans' Court, to make distribution of the assets or surplusage of the estates of decedents after settlement among creditors, or others interested. But this power cannot be exercised through the medium of an administration account, for the register has nothing to do with the estate after settlement of the account. It must be brought to the notice of the Orphans' Court by petition, either by the heirs, or some other person interested in the estate. The same may be said as to the remedy provided in the 3d section.

This seems to be an attempt to reach the real estate of the decedent, by subjecting it to sale, by the order of the court, for the balance due the administrator. But this object cannot be attained in this manner. The Orphans' Court will not grant an order for the sale of real estate for the payment of the debts of the intestate, which have lost their lien by lapse of time. The 4th section of the Act of the 4th of April, 1797, provides, that no debts, &c. shall remain a lien longer than seven years after the decease of the debtor, &c., unless an action for the recovery thereof be commenced and duly prosecuted, &c. within the period of seven years; or a copy, or particular written statement of any bond, covenant, debt, or demand, when the same is not payable within that period, shall be filed in the office of the prothonotary, where the lands lie. As the intention is to give notice of the debt, there is nothing in reason, or in the Act, which exempts an executor from its obligations; for although he cannot sue himself, there is nothing to prevent his filing a copy or written statement of his claim. Unless we require this, it puts it in the power of an executor to do a great wrong to purchasers and heirs, by concealing his own claims. The directions of the Act are very clear and precise; and nothing short of what is there required, can extend the lien of the creditor beyond the prescribed period. This case, it is true, presents a case of individual hardship, but we must be careful to prevent such considerations from affecting our judgments. The administrator, no doubt, who was acting for his grandchildren, pursued the course which he supposed would best promote their interest, without a thought that he was jeoparding himself; and we would willingly relieve him from the situation in which he has placed himself from his mistaken kindness. At first we doubted, whether the parol and written agreements that the bonds which he held against the estate, should be paid as they became due, would preserve the liens between the

immediate parties to the contract.  But with every disposition to relieve the accountant, we are unable to discover this intention expressed in the agreements, whatever might have been the understanding of the parties.  The administrator of Sheradin may have a remedy, in part, by suit on the agreement, which creates a personal responsibility, at least, and which may be rendered an effectual security, out of the proceeds of the land, which is pledged for its payment.

HUSTON, J. *dissenting.* — About the year 1815, in 8 *Serg. & Rawle* 347, we find the first decision in Pennsylvania that administrators could not bring into their account any money expended on account of the real estate or maintenance of orphan children, and there have been several decisions to the same effect since; though many accounts containing such items have constantly been passing the Orphans' Court in every county of the state, and several have passed this court without objection being made.  Where guardians have not been appointed, and the administrators are the near relations of minors, they uniformly lease the land, at least for one year, and if the rent is not all required for the maintenance of the minors, and is mingled with proceeds of personal estate and applied to pay debts, or forms a balance for distribution, there is no harm done, and very often counsel, where they are satisfied all has been perfectly fair, will not make any exception.  In this case, the administrator did lease the land for two or three years, and from the time guardians were appointed they leased it.  The administrator, who was the father of the widow and grandfather of the minors, and also the largest creditor by bonds given for the land which forms the only estate of the minors, had settled two accounts.  In both the accounts of 1826 and 1830, the administrator, as I understand it, charged himself with the rents, and took credit for the bonds paid by these rents—under the agreement with the guardians hereafter stated.  The account of 1830 was referred to auditors, who made a report on 13th November 1830, showing a balance in the hands of the administrator of $538.68.

While this account was before the auditors, John Weidenhammer, who was the guardian of two of the minors, viz. Catharine and Peter Clauser, and Samuel Fegely, who was the guardian of William, Maria, and Elizabeth, were examined, and their testimony is up before us with that account.  Weidenhammer proved that the administrator managed or leased the land until the guardians were appointed, about 1828.  At that time, seventeen bonds from Peter Clauser to the administrator, Sheradin, were still due. The guardians leased the land from their appointment—he says, "We had no agreement about the bonds, but every spring what was left after paying the expenses of the farm, we paid on the bonds as they fell due, from 1829 till last spring.  The old man

[Clauser's Estate.]

wanted us to try and keep the farm until the eldest son had his age, that he might have a chance of taking it—it was my meaning that the place should be kept until the eldest son should attain his age, and so we have done until this time. The farm is in better order and worth more than when Clauser died. Sheradin managed the farm well while it was under his care."

Mr Fegely, the other guardian, states substantially the same; he also says there was no agreement about the bonds, and also the wish of Sheradin that the lands should be kept until the son came of age, and that the guardians assented to this, and acted on it, and took up a bond each year.

It is to me evident, that neither of these Germans understood what they said in one particular. The word agreement they understood as a written paper—for they both state a parol understanding of what was to be done, fairly adhered to on both sides for nine years.

Before this settlement, viz. in 1829, the widow had married John Ressler. At the time of this settlement, the agreement of the 8th November, 1830, was entered into, in the presence and with the concurrence of Mr Sheradin, the administrator and creditor.

On the same day, viz. 8th November, 1830, Peter Sheradin, the administrator, paid to the guardians $439.25, who probably paid Ressler and wife; and in June, 1831, paid them the balance and interest.

All went on under this agreement until 1839 or 1840, when somehow John Ressler understood that the land had become clear from the debts of the grandfather, and the guardians were alarmed at some suggestion that they had paid money on bonds not a lien on the land of their wards.

Peter Sheradin then filed his third account, in November 1839; in this he for the first time, after charging himself with the balance on his last account, $538.68, and taking credit for the sums paid as above to the guardians, $439.25 and $105.89, proceeded to state what is now due, and will become due, on the remaining bonds from Peter Clauser, deceased. This account was, 10th January 1840, referred to auditors, who reported confirming it.

| | |
|---|---|
| Balance then due, . . . . . . . . | $738.37 |
| To become due, . . . . . . . . | 1242.98 |
| | $1981.35 |

This report was read and confirmed *nisi* at April, 1841.

In the meantime, while matters were under discussion, two of the daughters, who were married, and their husbands, and a third daughter, who had come of age, entered into the agreement of the 18th December 1839, with Peter Sheradin, the grandfather and administrator and creditor.

The two sons are yet under age. Ressler, who has had the

I.—28　　　　　T

benefit of the agreement of 8th November 1830, and (it is said) the two guardians, except to the account, because the auditors erred in allowing credit for the two payments to the guardians, in 1830, 8th November, of $439.25, and of $105.89 in June 1831; in allowing credits for payments on all bonds since 1830, and allowing a statement to be filed of what is due; and in allowing three or four small items for stating the account and register's fees, and $10 to accountant, &c.

The court rejected this whole third account, and refused to let it be filed; and from this, an appeal to this court is taken.

The objections to filing this account are several:

1. No law or usage for it.

2. It was not necessary, but was done to introduce the administrator as a creditor.

3. The administrator intended to apply on this account for an order to sell the estates. I will observe here, in point of fact this is not so. The last agreement above proves this, and estops Sheradin from such application to sell.

4. The debts due the administrator had ceased to be a lien on the land.

The first is the most important, if not the only important point at this time. The case of *Billington's Estate*, (3 *Rawle* 48) is in some respects applicable here. In that case guardians had never acted, but one of them had been the legal adviser of the administratrix. The proceeds of personal estate, and the rents and proceeds of lands sold by order of Orphans' Court, had been all blended. The debts were paid and the children supported and educated. The administratrix was allowed for all; she applied them to the maintenance of the children and payment of the debts, and charged herself with the personal and real estate and the rents. The reference to the auditor was drawn up by the late Chief Justice, modified at the suggestion of counsel, and justice was done.

By the Act of 29th of March 1832, *sec.* 4, the jurisdiction of the Orphans' Court shall extend to, *inter alia*, " the settlement of the accounts of executors and administrators, and the distribution of the assets or surplusage of the estates of decedents, after settlement with creditors;" and again; " to all cases within the respective counties wherein executors, administrators, guardians, or trustees, are, or may be possessed of, or *undertake the care and management of, or are in any way accountable for any real or personal estate* of a decedent."

The 29th section allows the balance of an administrator's account to be filed by the prothonotary of the Common Pleas, and makes it a lien on the estate of such accountant. This was the same under former laws.

The 30th section authorizes the Orphans' Court to examine into the settlement and payment of that balance; and on satisfactory

[Clauser's Estate.]

evidence that it has been discharged, to make an order for relief from such recorded balance.

The Act explaining the jurisdiction of the Orphans' Courts, 16th of June 1836, gives to them the same powers in these particulars in the same words, and adds power to enforce payment of legacies which, perhaps, it had not before.

In this case the administrator had filed an account showing a balance of $538.68 in his hands; no order for distribution was asked or·made. We hear a good deal about informalities in the Orphans' Court; but I do not believe there is any county in this state, in which an order for distribution is not made where it is understood the account is a final one; no such order appears here. The administrator did pay the balance to guardians, who apply it to pay a sum agreed to be paid to the widow. I know of no court which has power to decide whether that was a legal application of that money, but the Orphans' Court of that county. If the administrator had a right to file his account to show how he had applied the balance of his second account, the court were bound to receive it and decide on it, and, of course, on the other small items. There was no discussion of this part of the case, no decision on it in the Orphans' Court. The case there and here was put on the question, whether on the authority of *Kerper* v. *Hoch*, (1 *Watts* 9) the claim of the grandfather's administrator had not lost all lien on this estate for the balance of his bonds. I shall only say it has not yet been decided that there can be no possible case which will be out of the principle of that case. The question does not arise on the record before us. As to the payments made to the grandfather by the guardians since the expiration of seven years from the death of Peter Clauser, the question may arise when they settle their guardianship accounts; it can not arise until such accounts are presented, as to the two younger children, for the last agreement by those who are of age would seem to prove that they will ratify what the guardians have done.

The Act of 1797 requires the statement of the bonds to be filed within seven years, and·in the records of the Common Pleas; now the year 1839 was too late a period to save the lien under the case last cited; and stating the claim as one due in an administration account, is no compliance with that law; besides, a statement in the administration account that certain debts are still due by the deceased, is mere surplusage; the court can not and do not decide unless an application is made to sell, that such debts are justly due. If an application for a sale of land be founded on such statement, it may become material; but no such application was made, and the agreement of 18th of December 1839, shows that no intention to apply for a sale existed, and bound the administrator not to make such application.

Perhaps it is to be regretted that Ressler did not adhere to his agreement not to meddle with the estate until 1842: by that time

the son will be of age, and it is within the bounds of possibility, nay, it is probable, that he may see the conduct of his grandfather and the guardians as his sisters and their husbands have seen it, and may refuse to requite their care and kindness by subjecting them to loss, merely because they were kind to and careful of his interests.

Part of the account ought to have been received and decided on; and the residue of the points made in this case left, until they arose, if they ever do arise, in some future stage of this business.

But it is said that *Shenck's Appeal*, (5 *Watts* 84) decides this case. The facts of that case are not very minutely stated; but Shenck was one of the executors of a large estate. Another executor had the inventory taken, collected, and paid, and distributed above $40,000, and settled his account, which was confirmed. After this, Shenck, who was a creditor of the estate, filed an account, charging himself with the amount of the inventory, taking credit for the same amount delivered to his co-executor, and charging the estate with a sum due to himself; and this court decided that he could not, after the settlement of the estate, of which he had notice, file the account offered. The opinion of this court, delivered by the Chief Justice, commences thus: "The executor would have been entitled to exhibit an account, had he been in the possession of any assets not already accounted for, or had he been out of pocket for disbursements in his office; but not to give himself a remedy for a debt due to himself by the testator in his lifetime." Now I do not suppose it was intended to say that an acting executor, who was a creditor, could not put the debt due to himself in his administration account; that has always been done, and must be done; but simply to decide the case that an executor who never acted and never had any assets in his hands, who stood by with notice of the settlement of his co-executor, and made no objection, could not undo all that had been done, to let in his own neglected account.

But in this case P. Sheradin had in his hands $538.68, and this he was as much bound to account for in the Orphans' Court as he was for the amount of the inventory. I think I have shown this by the parts of the Act of 1832, establishing the Orphans' Court, already cited. But, to remove all difficulty, I refer to the Act of 24th February 1834, *Tit. Executors and Administrators, sec.* 31. Peter Sheradin had died since this decree of the Orphans' Court, of course there will be administrators *de bonis non.* They may sue the representatives of Sheradin for the amount of his last settlement. Now, by the section last cited, they must settle that account in the Orphans' Court, and the Common Pleas can only give judgment for the sum there found due; and this is the wisest and best provision in the law. Formerly an administrator had to settle an account in every suit by a creditor or person entitled to

[Clauser's Estate.]

distribution, and prove all his vouchers, and produce all his witnesses at each trial. By this law his accounts settled in the Orphans' Court, either before or after he is sued, and not appealed from, bind all persons.

I say nothing about that part of the account which states his claim to a large sum of money; stating it here will not make it better or worse; but its binding effect is not before us. If he had applied for a sale to raise this debt, and the Orphans' Court had refused, or had ordered a sale on an appeal, this matter would have been the point to be settled. There was no doubt about the case of *Kerper* v. *Hoch*, (1 *Watts* 9,) as between the parties to that case; an heir, who has taken part of the estate at the appraisement, and paid the other heirs, is a purchaser; the rest of the case was not in the cause, nor argued by the counsel. I do not say whether right or wrongly decided; but this agreement or arrangement of P. Sheradin and the guardians was made in 1829, more than four years before that decision was published. The agreement was for the benefit of the children; at that time no lawyer or layman anticipated the decision abovementioned. Is that decision to have the effect of annulling previous agreements? of making guardians liable to pay or to lose large sums, when the agreements were made and the money paid rightly, according to the law in all time past? This question is not new; it came before Chancellor Kent in *Lyon* v. *Richmond*, (2 *Johns. Ch.* 60) and he says, " a subsequent decision of a higher court, in a different case, giving a different exposition of a point of law from the one delivered and known, when a settlement between parties took place, cannot have a retrospective effect and overturn such a settlement. To permit a subsequent judicial decision in any one given case, on a point of law, to open or annul every thing that has been done in other cases of like kind for years before, under a different understanding of the law, would lead to the most mischievous consequences." And Judge Story (*Story's Eq.* 142) has given his sanction to this doctrine in the strongest terms.

I would not, therefore, decide a point not in the record before us, but introduced to feel the way for future suits, in this way or at this time.

Decree affirmed.