DISTRICT COURT.                                   APRIL 28, 1859.

CRIMINAL LAW.

## THE UNITED STATES *v.* VONDERSMITH

1. Under an indictment for forgery evidence of kindred transactions may be introduced to illustrate or establish the intent.

2. A jury in a criminal case may judge of the law as well as of the fact; but it is the office of the Court to expound the law to the jury who have, in general, no other standard of law which, as good citizens, they can desire to follow than the opinion of the Court.

3. Several papers and parts of papers necessary in the establishment of a claim for pension, were forgeries uttered in support of a claim wholly fictitious. *Held*, that a general description of their character and object as one paper is not insufficient or inaccurate.

4. A designation of a forged paper as "a certain writing" is sufficient even in a case where the indictment is under a statute in which the instrument is named.

5. It is not a valid objection to an indictment in a forged attestation to pension papers that it is not the entire paper, but a part only, the effect of the whole being stated by way of inducement. But where there is another indictment alleging the paper as a whole, the defendant cannot be convicted on both.

6. The forging of the name of the appointor to a power of attorney and afterwards filling in the name of the appointee, constitutes the offence of procuring a forgery as distinguished from forgery.

7. The limitation of a prosecution for forgery in the Act of Congress of 30th April, 1790, is two years, within which time an indictment must be *found* or an information *instituted*, exclusive of the period during which the defendant may have fled from justice.

8. Where the defendant's flight occurred on the same day of the same month as the performance of his last act in the forgery two years before, the prosecution would be barred, except where by comparison with other periods of limitation in the same act it appeared to be the intention of the legislature to include within them the last day.

THE DEFENDANT, Judge Vondersmith, was tried under several indictments, for forging pension papers, a species of

transaction in which he appears to have been engaged for a number of years.　THE COURT charged the jury as follows:

## CADWALADER, J.

An act of the Congress of the United States, passed on 3d March, 1825, made it felony to forge, or cause or procure to be forged, any paper, writing, or instrument in imitation of, or purporting to be, any letter of attorney, or other authority or instrument, to receive any pension due or to become due from the United States, or the name or names of any person entitled to any such pension.　An act of 3d March, 1823, had already made it felony to forge, or cause or procure to be forged, not only a power of attorney, but also a certificate or other writing, for the purpose of obtaining or receiving, or of enabling any other person or persons, either directly or indirectly, to obtain or receive any sum or sums of money from the United States, or any of their officers or agents.　This act likewise makes it felony to utter or publish any such forged writing as true, with intent to defraud the United States, knowing it to be forged; and also makes it felony, with such intent and knowledge, to transmit it to, or present it at, or cause or procure it to be transmitted to, or presented at, any office or officer of the Government of the United States.

The defendant is charged, under these acts, with having forged, or procured to be forged, uttered as true, and transmitted to the office of the Commissioner of Pensions, pretended applications in the names of non-existing persons for money alleged in them to be due for pensions to widows and children of officers and soldiers of the Revolutionary War, supported by pretended affidavits which the pretended deponents and subscribers never deposed or subscribed, and by certificates which the pretended attestants never subscribed or saw.　In legal proceedings, the presumption is always in favor of innocence rather than of guilt; and, in proceedings for criminal offences, the party accused is entitled, under this presumption, to the benefit of any reasonable doubt of his guilt that can be honestly entertained.　If the proof to sustain the present prose-

cution had rested upon the testimony concerning the making by the defendant of applications in the names of non-existing persons, in the particular cases in which it is charged in the indictments, a doubt whether he had not been himself imposed upon by some deceitful party personating the supposed applicant might perhaps have been suggested. For this reason proof has been given, in support of the prosecution, of transactions of the same character, composing a series, in which the cases in question are included. This proof has been adduced in order to show that, from their multiplicity, they cannot have occurred innocently. In the language of the Supreme Court, when the question to be tried is one of fraudulent intent, "it has always been deemed allowable, as well in criminal as in civil cases, to introduce evidence of other acts and doings of the party, of a kindred character, in order to illustrate or establish his intent or motive in the particular act directly in judgment. Indeed, in no other way would it be practicable, in many cases, to establish such intent or motive, for the single act taken by itself may not be decisive either way; but when taken in connection with others of a like character and nature, the intent and motive may be demonstrated almost with a conclusive certainty." (16 Pet. 360.) It had been decided previously by the House of Lords in England, in a case in which the opinion of the Judges was taken, that, when the question in issue was whether a defendant knew that the name of a non-existing party to a paper was fictitious, his knowledge could be shown by proof of numerous other cases in which he had acted upon similar papers in the names of non-existing persons, under circumstances precluding a reasonable belief that he could, in so many cases, have been ignorant of the truth. (2 H. Bl. 288.) In cases of prosecutions for forgery, the question, in different forms, has often been presented for decision. There never has been a case, perhaps, in which such testimony was more proper than the case which you are to determine. Some of the transactions proved are, it is true, remoter in date from the transaction in question than those of which proof has been given in other cases. But their uniformity, identity of

purpose, and connection as a series, has been established so as to render this, in the opinion of the Court, an immaterial distinction as far as the mere admissibility of the evidence is concerned. But this evidence, except on the question of guilty intention alone, is entitled to no consideration, where it is not applicable directly to the particular cases of alleged forgery charged in the indictment.

On the part of the prosecution, proof has accordingly been made of a series of forgeries, consisting in the preparation and presentment of fictitious writings, in order to obtain pension certificates to non-existing persons, receive pretended arrears of pension money, and draw pretended accruing pensions to such fictitious persons.. The system through which these frauds were practiced appears to have been to ascertain, in every case, the name of an officer or soldier of the Revolutionary War to whom no pension had, as yet, been granted; to forge, in every such case, a certificate, purporting to be sworn by the pastor of a church, of the registry of the marriage of the officer or soldier; to forge affidavits of the military services of the officer or soldier during the war, his marriage, and his death, of pretended reasons explaining the delay in presenting the application, and of such other pretended facts as were thought necessary to support it, and forge also such official attestations of local magistrates, as acts of Congress, or the regulations of the pension office prescribed. In most of the cases, the pretended applicants were described as the widows of the respective officers or soldiers. In the other cases, the forged affidavits had stated the deaths of the respective widows, and the pretended applicants were described as children of the respective officers or soldiers. In this manner, certificates, in one form or the other, in favor of the fictitious applicants, were obtained from the Pension Office at Washington in more than twenty cases. The forged papers appear to have been in the handwriting of the defendant, or in that of copyists employed by him for the purpose, in all of the cases except two or three, in which his privity has been shown in other modes. After the official certificates had been thus obtained from the Pension

Office, through the forged papers, the forgeries were, in another form, repeated, as the subsequent instalments of supposed quarter or half-yearly pension money were to be obtained from the Pension Agency at Philadelphia. Forged powers of attorney, to receive the respective amounts, with forged certificates of acknowledgment, accompanied by forged affidavits of the pretended pensioner, with forged jurats, were brought or forwarded to the Pension Agency. The forged affidavits contain in each case a copy of the certificate for the supposed pension, which had originally been obtained from Washington. These forged affidavits, and also the forged powers of attorney, were, according to the testimony, in the defendant's handwriting in every case. If there had been any defect in the proof of his privity to the forgeries through which the pension certificates had been obtained, in the two or three cases in which the original papers had been in a different handwriting, these later forgeries, which are distinctly proved to be in his handwriting, supply any link in the chain of testimony which might have been wanting. The pretended powers of attorney, as I have said, are all in his handwriting. In some of them he was named as the attorney to receive the pension; and there is proof that he received some of the amounts with his own hand. A particular form of oath was required before an attorney could receive a pension. An act of Congress of 22d February, 1840, authorized the local pension agent, and an act of 19th of February, 1849, authorized his deputy or clerk, to administer this oath. In the cases in which the defendant received the amounts with his own hand, he, in person, took this oath. In the other cases, the money was collected through the agency of banks. The usual course, and that pursued in these cases, when the money was collected through banks, appears to have been to leave the name of the attorney in blank. The power, in this form, was taken by a messenger of the collecting bank to the pension agency, where the messenger took the affidavit, and received the money. The name of this messenger, as attorney, was inserted in the blank in the power, at the time when the payment was thus made. The

subsequent receipt by the defendant, through a bank at Lancaster, of the money collected through these powers by the bank messengers in Philadelphia, has been traced, in some of the cases, by evidence of which the effect has not been disputed; and the jury will probably think the proof extremely clear that he knew how the business was conducted by the collecting banks, and that he prepared the powers purposely in blank that the blanks might be thus filled.

According to the testimony, more than $40,000 was fraudulently obtained from the United States by the defendant, in sums varying from very small to quite large amounts, in the names of fictitious persons, by means of these forged papers. The last appearance of any of these fictitious names in the Pension Office was in connection with the semi-annual payments of pensions in September, 1853. Before the next semi-annual day of payment the present prosecution had been commenced. It was begun on the 7th of February, 1854. The defendant gave bail for his appearance in this Court. He was to appear on Monday, the 29th of that month. On the night of Sunday, the 19th, according to the testimony of Dr. Leonard, the defendant left his residence at Lancaster, where he then held an important public employment. He did not return for between two and three years, during which time, according to the testimony of one or more of the witnesses, he was in Europe. The proof, in law, that this was a flight from justice, is ample, if you should believe, as you probably will, that it was, in fact, such a flight. When a party charged with a crime is not in actual confinement, a fleeing from justice cannot ordinarily be proved in any other manner than that in which it has been proved here. The proof that he thus absconded would, if the case had been a doubtful one as to his guilt, have been evidence against him entitled to your consideration. But you probably will think that the more direct proof of his guilt, of which I have said something, and will say something more presently, is too decisive to require any such support. The circumstance of his flight will, however, become important when we come to consider the question of limitation of time.

Of the series of cases of which the details have thus been given in evidence, two have been made the subjects of the present prosecution. They may be designated as the cases of the pretended widow of William Russell, and the pretended children of Andrew Lytle. I will call them respectively the Russell Case and the Lytle Case. That no such persons as the pretended applicants or supposed pensioners existed has been very distinctly proved, and that the papers were all forgeries has been proved not less clearly. . The proof has not been of an uncertain or indirect character, like that of mere difference, or want of resemblance, in handwriting. Such testimony is often unsatisfactory. But, in the present case, the original papers have been laid before the living persons whose signatures to the attestations were forged. These persons have, on oath, sworn, without any qualification or doubt, that the signatures are not their own. It is impossible that they can have been mistaken. All doubt upon the subject, if there could have been any, must, however, be removed by the circumstance of the absolute forgery in every one of the twenty or more cases of the marriage certificates on which the applications were founded. The existence and identity of the pretended applicants depended, of course, upon these marriages. In the two cases which are the subjects of the indictments, besides this proof of the falsity of the marriage certificates, the attestations of the judges and aldermen, and the certificates or depositions of the pretended ancient witnesses, are directly proved to have been forged. Surviving members of the family of the soldier or officer in whose right the pretended claim was made have testified to the actual falseness of the respective names of the pretended widow and children. In these and in some of the other cases of the series an amount of proof has been accumulated such as probably was never before adduced applicable to transactions so numerous.

·  The tendency of this proof has been simple, direct, and uniform. Besides the proof that, in hundreds of cases, the signature of his name to the attestation of the forged papers as a witness is in his own handwriting, and that hundreds of them

are bodily in his handwriting, the official signatures of alder-
men and judges of the city and county of Lancaster, where he
resided, of the pastor of his own church, of inmates of his
household, of his relations and his friends, as well as of per-
sons who probably were strangers to him, are proved to have
been forgeries; and he afterwards, in various modes, acted
upon the forged papers by transmitting them to the Pension
Office, and receiving the instalments as they from time to time
fell due.

The Russell Case, as I have called it, is the subject of four
indictments, which were found on 4th March, 1854; the Lytle
Case, of two indictments, found on 16th March, 1854. The
defence has been pressed principally on technical points, upon
which the jury will probably desire to be governed by such opin-
ion as I may, after consideration, have formed. A jury in a
criminal case may judge of the law as wel as of the fact. But
it is the office of the Court to state and expound the law to
the jury, who have, in general, no other standard of the law
which, as good citizens, they can desire to follow, than the
opinion of the Court. The points, as I view them, except so
far as the question of limitation of time is concerned, will de-
pend in a great measure upon questions arising upon the face
of the indictments. One of these questions, however, will in-
volve a point on which the jury will be required to pass as
matter of fact, though the evidence upon it is of so distinct a
character that its determination by them will probably be
attended with no difficulty.

The first of the indictments to which I will ask your attention
(February Sessions, 1854, No. 13) is that in which the de-
fendant is charged, in the first count, with forging and pro-
curing to be forged the papers which accompanied the original
application in the Magdalena Russell Case, all dated in Novem-
ber, 1846, purporting to be her affidavit of service of her
husband, William Russell, in the Revolutionary War, of their
marriage, of his death, and of the reasons which had delayed
her application—with a jurat before Judge Shaffer, and an
attestation by him of her credibility, a certificate on oath by

four attestants of the material facts in her affidavit, with a jurat before the same judge, and his attestation of their character, and a certificate purporting to have been sworn before Alderman Evans, by the Rev. John C. Baker, of a register of the marriage of William and Magdalena Russell, for the purpose of fraudulently obtaining pension money to Magdalena Russell, no such person being then in existence. He is charged in the second count of the indictment with transmitting to the Pension Office, and in the third count with uttering, the same writing or writings. The objection made to this indictment is, that the character of the writing alleged to have been forged is not sufficiently described in it. The indictment sets the fictitious papers forth according to their tenor, after describing them as "a certain writing and writings purporting to be signed and executed by the parties whose signatures are thereto affixed, and which *certify to and pretend to establish the existence of a certain Magdalena Russell as a pensioner* of the United States." This is not on its face an *inaccurate* description of the papers. If they had been genuine, they perhaps could not have been thus made collectively the subject of a single count for forging, though the objection would not have applied to the counts for transmitting and uttering. But, as papers in a case wholly fictitious, and themselves wholly fictitious, and all forged by the same hand for the same purpose, they might be regarded as constituting, together, either a single paper or several papers. The evidence in this respect might not support such an indictment. But an objection to it could not be sustained upon its face. Then, if the writing is not *misdescribed*, we recur to the question whether it is *insufficiently* described. A conclusive answer to this objection is that there was no necessity to describe its character at all.

The form of an information for forgery at common law is in Ward's Case, 2 Lord Raymond, 1461, and 3 Lord Raymond, 358, which is also in the Crown Circuit Companion, and in Chitty's Precedents of Indictments. It was a prosecution for endorsing upon a certain certificate in writing, by which the defendant was obliged to deliver a certain quantity of

alum to the Duke of Buckingham, a forged order from the Duke for the purpose of avoiding its delivery. The subject of the alleged forgery was designated as "a certain writing in the words and figures following," without any other description, and the case, after great consideration on other points, resulted in a conviction. The objection that the paper was not sufficiently described was not even taken. It could not have been taken, because the Court could judge of the character of the writing from its contents, whether the indictment gave it a name or not. But it is suggested that when the indictment is upon a statute making penal the forgery of a certain instrument by name, it must be described by the name, given to it in the statute.—Mr. Chitty seems to be of the conrary opinion. He says, "Though it is *sufficient* to aver that the defendant forged a certain writing, describing it truly, and setting forth its tenor, it seems *more proper* to lay it as a certain paper writing, purporting to be the instrument which the statute on which the indictment is framed, describes."— This is cautiously expressed so as to avoid the intimation of an opinion that such a designation by name of a paper of which the contents are fully set forth, can ever be a matter of legal indispensable necessity. But, supposing that a case might occur in which the use of the descriptive name contained in such a statute would be necessary in an indictment, such a case cannot be presented under a statute like the act of Congress of 1823, in which the words "or *other writing*" form a part of the legislative description of the subjects of certain forgeries defined with a view to their purpose, rather than their character.

In the present case, if a description were necessary, the descrptive words in the indictment would suffice. The indictment is, I think, well drawn. It fulfils the substantial conditions of describing the offence charged so as to show its legal character, and of describing it with such certainty that the offence of which the defendant might be convicted or acquitted would afterwards be known.

The next indictment which will be mentioned (February

Sessions, 1854, No. 14) contains three similar counts, except that their only subject is the forged attestation, by Judge Shaffer, of the credibility of the fictitious Magdalena Russell.

Of this paper the indictment contains a very precise description, to which no objection has been made. One objection taken is that it is not an entire paper, but a part only of the papers attested. This objection cannot prevail. The question is on the face of the indictment. The other papers might all have been genuine—that is to say, not forged—and yet have wanted the credibility which this attestation would have given to them.

The attestation might therefore have been the subject of an independent forgery. But then it is objected that if this were so the papers of the applicant whose credibility was attested ought to have been set forth in the indicament. This would be a very unreasonable and inconvenient rule. In Ward's Case, the certificate on which the forged endorsement was made was not set forth. It was described by words of reference only, with less particularity than in this respect has been observed in the indictment in question. The objection was taken that it was not shown *how* the defendant was chargeable to deliver the alum in the within written certificate. But the answer was that this was only matter of inducement, which need not be shown; and of this opinion was the Court.

There is nothing, therefore, in the objections to the indictment. But as the attestation of Judge Shaffer is also given as part of the subject of the forgery alleged in the other indictment, I am of opinion that though, independently of the question of limitation of time, he might be convicted on either of the two indictments, he ought not to be found guilty on both. But the view taken of both indictments on the question of time will render this opinion immaterial.

The next indictment which will be mentioned (February Session, 1854, No. 8) is for forging, and procuring to be forged, a writing purporting to be a letter of attorney from Magdalena Russell, authorizing Dennis Driscoll to receive her pension from September, 1852, to March, 1853, and pur-

porting to be acknowledged on the 4th of March, 1853, before Alderman Evans, for the purpose of receiving from the United States money pretended to be due to her, no such person being then in existence. Another indictment (February Session, 1854, No. 7) contains a similar charge of forging, and pro-- curing to be forged, her power, made on the 5th of September, 1853, authorizing the receipt of her pension from the 4th of March to the 4th of September, 1853.

The objection to these two indictments arises upon the fact, which does not appear upon their face, that when they were written by the defendant the name of Dennis Driscoll was not in either of them. He was one of the runners or messengers of a bank in Philadelphia, which collected the pensions for a bank at Lancaster in the mode already explained. The objection is that the power in each case as forged by the defendant was in blank and did not purport to be a power to Dennis Driscoll, and that it is therefore misdescribed in the indictment.. The evidence is that the power in each case was drawn by the defendant in the name of the pretended pensioner, who was a non-existing person, in order to defraud the United States of the money described in it as her pension, and that a blank was purposely left for the future insertion of the name of the agent, which it was intended by him should be filled, as it was in fact filled, at the time of receiving the money from the pension agent of the United States. If the jury shall so find, as probably they cannot but find, from the evidence which is un-contradicted, the defendant was in law guilty of the offence of *procuring* the powers of attorney, to be forged in the manner described in these indictments. It might, perhaps, be said that he was legally guilty, not only of procuring them to be forged, but of forging them as described in the indictments, or that the two charges are in effect the same. (See Elizabeth Dunn's Case, 2 East's C. L. 976, Polhill & Walter 3, Barnw. & Adolph, 121 to 124.) But I do not so state the law. The act of Congress makes it felony to procure such a paper to be forged, as well as to forge it; and I place my instruction on the particular ground that if you find the facts which the evidence

tends, as I have stated, to prove, the defendant is guilty of *procuring* these powers of attorney to be forged.

The two remaining indictments (Feb. Sess., 1854, Nos. 24 and 25) are those in the Lytle case. One of them (No. 24) is for forging, and procuring to be forged, a paper purporting to be John Lytle's affidavit sworn on 9th February, 1852, in order to obtain a pension for himself and Cyrus Little, setting forth the services of their father, Andrew Lytle, in the revolutionary war, his marriage to their mother, Margaret Lytle, the deaths of Andrew, and afterwards of Margaret Lytle, etc., with a jurat before Judge Long, for the purpose of obtaining pension money from the United States, no such person as John Lytle being then in existence. There is a second count for transmitting, and a third for uttering the same writing. It is described as "a certain certificate and writing purporting to be signed and sworn to before and in the presence of H. G. Long, the President of the Court of Common Pleas of Lancaster County, whose name is thereto annexed." It is set forth according to its tenor. The remaining indictment (No. 25) is composed of three similar counts, the subject being a forged separate attestation by Judge Long, of the fictitious John Lytle's credibility.

These two indictments do not, in their character, or purpose, differ from the two indictments as to the original papers in the Russell Case. But, in the Lytle Case, all of the papers, except the pretended affidavit of John Lytle, were in the handwriting of an amanuensis, employed by the defendant for the purpose. The portion of the papers not in the defendant's handwriting have not been made the subject of these indictments. The paper in the defendant's handwriting has the jurat of Judge Long. But the forged certificate of the pretended deponent's credibility, by the same judge, is not, as it was in the Russell Case, contained in each indictment. In the Lytle Case this paper is the subject of a separate indictment, but it appears in this indictment only. Consequently, if the limitation of time were out of the way, you could find a verdict for the United States on both indictments in the Lytle Case, instead

of being able to do so on one of them only, as in the indictments upon the original papers in the Russell case.

The objections made to the indictments in the Lytle Case, have been disposed of in considering the objections to the indictments in the Russell Case. The indictments in the Lytle Case would not be liable, however, to some of the objections which were made in the Russell Case, even if those objections had been sustained.

On the whole, I think that the indictments are not only technically sustainable, but are drawn with skill. I say this because they were prepared by counsel who has not been present during the trial. I may add that they have the merit of conciseness, which, when pleadings are sufficient, is a great merit. I have considered them fully because they have been criticised with freedom, if not with severity, in the course of the cause.

If the cause had rested here, the jury would, probably, have had little difficulty in finding the defendant guilty on five of the six indictments.

But a question as to the limitation of time for the prosecutions remains to be considered.

The act of Congress of 30th April, 1790, provided for the punishment of certain crimes defined or specified in it, some of which were, and others were not, made capital offences. The offences made capital were treason, wilful murder in places within the exclusive jurisdiction of the United States, certain crimes, including murder committed on the high seas defined in the act as piracy, forging public securities issued in the name of the United States, and the forcible rescue of persons convicted of treason, murder, or any other capital crime. The 32d section enacts "that no person shall be prosecuted, tried, or punished for treason or other capital offence *aforesaid,* wilful murder or *forgery excepted,* unless the indictment for the same shall be found by a Grand Jury within three years next after the treason or other capital offence *aforesaid,* shall be done or committed; nor shall any person be prosecuted, tried, or punished for any offence, *not capital,* nor for any fine or forfeiture under any penal statute, unless the indictment, or

information for the same, shall be found, or instituted, within two years from the time of committing the offence, or incurring the forfeiture aforesaid; provided that nothing herein contained shall extend to any person or persons fleeing from justice." The Supreme Court has decided that the limitation of time for the prosecutions for fines or forfeitures under the latter clause of the act extends to prosecutions for penalties afterwards created. (2 Cranch, 336.) The limitation of two years for the prosecution of offences *not capital* must extend, therefore, to offences afterwards made the subject of criminal prosecution. Prosecutions for these offences are provided for in the same sentence, and by the same words, as fines and forfeitures. Therefore the limitation of two years in the act of 1790 includes the offences not capital which were made felony by the subsequent acts of 1823 and 1825, unless offences of the denomination of *forgery,* though not capital, are excepted by the words of exception in the prior clause of the act of 1790.

This prior clause differs from that which was the subject of consideration by the Supreme Court, in the introduction of the word *aforesaid,* which is twice used. Literally the wilful murder and forgery which are excepted from the limitation in this prior clause, are such wilful murder and forgery only as had been made offences in prior parts of the act. An exception ordinarily does not include a particular subject not embraced in the definition of the general subject out of which it is taken. Nevertheless if this had been an act of a legislature of one of the States of our Union, having a system of criminal *jurisprudence,* and likewise a general power of *legislation* as to crimes, I should think that this exception of wilful murder and forgery designated the whole classes of offences embraced in those respective denominations, and that the legislative meaning of the words was that there should be no limitation of time for prosecutions of *such* offences. Many reasons on the face of the act for such an interpretation of it might be suggested, and the word *aforesaid,* as used in it, might, under such a system of government, be reconcilable

with such an interpretation. But whatever opinion may have prevailed in Congress at the date of the act of 1790, there is no federal *jurisprudence;* and, therefore, no offence against the United States could *legally* constitute a crime until made such by an act of *legislation.* We are bound to presume that the act was passed with a knowledge, in this respect, of the law. A mistake of law cannot be imputed to legislators unless it is apparent in the language of their legislation, and even when their language seems to indicate it should never be imputed without extreme caution. In the present instance, no such mistake on the subject is apparent; and, therefore, none should be imputed. Now, neither the crime of wilful murder nor that of forgery, as an offence against the United States, could be cognizable as a capital offence *aforesaid,* unless it had been provided for in this act, because it was the first act in the federal code of *criminal* legislation. Supposing, therefore, that the question could be relieved, as possibly it might, of the effect of the single word *capital,* I do not see how the word *aforesaid* in this clause of the act can be safely disregarded.

With great doubt upon the subject, in the absence of all pertinent authority except the single decision in 2 Cranch, which has been mentioned, I instruct you that the limitation of time contained in the act of 1790 applies to the crimes in question, which are made felonies, but not capital offences, by the acts of 1823 and 1825.

But if you believe, as you probably do, that the defendant *fled from justice,* on the 19th of February, 1854, the time between this date and the finding of these bills of indictment in the next following month of March, should be disregarded. The counsel for the prosecution have asked me to instruct you that under the words of the Act of 1790, you can go back still farther to the 7th of February, when the defendant was first arrested by the deputy marshal, which they say was the time when the prosecution was instituted. The words of the act in the clause in question are, unless the *indictment,* or *information* "shall be *found* or *instituted* within two years," etc. But I am of opinion that the word

*instituted* applies to the proceeding by *information,* and the word *found* to a proceeding by *indictment.* This opinion is confirmed by a recurrence to the phraseology of the prior clause of the act. Consequently, I do not think that the prosecution can go back to a date prior to that of the defendant's flight on the 19th of February, 1854. I advise you, therefore, if you view the evidence as I do, to take this date as the time.

Under these views the prosecution under the two indictments upon the original Russell papers, is barred by lapse of time. The two indictments upon the subsequent Russell powers of attorney of the year 1853, are not in any manner affected by lapse of time. The two other indictments, which are those in the Lytle Case, require more particular consideration. As to the papers mentioned in these indictments, no act of the defendant appears to have been performed in *this* district after the 19th of February, 1852, when they were transmitted by letter to Washington. His flight, according to the testimony which I have already quoted, occurred on the same day of the same month, in the year 1854. Unless the 19th of February, 1854, was "within two years from" the 19th of February, 1852, in the sense in which the words of limitation are used in the act of 1790, the prosecution under these two indictments is barred. I should have had no doubt that an indictment found on the second anniversary was too late, if it had not been for the contrast of the phraseology in the two clauses of the 32d section of the Act of 1790. The prior clause bars prosecutions in certain cases, unless the indictment is found "within three years *next after* the" offence committed. The subsequent clause now in question bars the prosecution unless the indictment is found *within two years from* the time of committing the offence. If either phaseology had been adopted in both clauses, the prosecution would be barred. The only question is, whether the *contrast* in phraseology warrants a distinction which, in the interpretation of this act, would, under one of its clauses include, and, under the other clause ex-

clude the anniversary.   This would be contrary to established
rules for interpreting statutes of limitation.   (See 5 Barnw.
& Alders, 215; 3 Brod. & Bingh. 227; 10 Serg. & Raw. 211;
1 Watts, 17; 3 Harris & McH. 258, 289, 294, 297, 301, 317;
5 Cranch. Circ. Ct. Rep.)   Such statutes are so construed that
the application of their several clauses may, if possible, be
uniform, notwithstanding variances in their phraseology.   I
am, therefore, of opinion that the prosecution under these
two indictments is barred.

According to these views of the law, your verdict on four
of the indictments will be for the defendant.   Upon the two
others (Nos. 7 and 8) you are to find the facts of which you
are the sole judges.   If you adopt the views which the Court
has deduced from the evidence, you will find the defendant
guilty on these two indictments.

The jury found a verdict of guilty on these two indict-
ments, and of not guilty on the other indictments.