## Fetterman *against* Murphy.

A sheriff's sale of an intestate's land, upon a judgment fraudulently obtained, to the attorney who obtained it, is void as to the owners ; but if it has been subsequently conveyed to an innocent purchaser, he is not affected by the fraud, and will have a good title.

A judgment against a decedent at the time of his death, is a lien upon his real estate ; and a revival of it twelve years after his death, and a sale of such estate, will divest the title of his heirs.

ERROR to the common pleas of *Alleghany* county.

This was an action of ejectment by W. W. Fetterman and Alexander Metcalf, against John Murphy, for a house and lot in the city of Pittsburgh.

In 1807 William Nixon, under whom both parties claim, was the owner of the house and lot in controversy.   In 1808 a judgment was obtained against him, upon which an execution issued in 1809, which the sheriff returned "money made."   In 1814 Nixon died,

leaving several children, and Flora Nixon and Robert Stewart became his administrators. To January term 1827, a *scire facias* was issued by S. Kingston, attorney for plaintiff, against the administrators of Nixon, to revive the original judgment, which was returned "served on both defendants." To this, Mountain, attorney for defendants, appeared and pleaded *plene administravit*, and confessed judgment *de bonis intestati.* Sum liquidated at 127 dollars 35 cents; 13th February 1827. A *fieri facias* issued to April term 1827, which was levied upon the property in controversy; a *venditioni exponas* to August term 1827, which was returned, that the property was sold to S. Kingston for 45 dollars, to whom the sheriff made a deed. On the 4th of January 1828, S. Kingston conveyed to John Murphy, the defendant, in consideration of 700 dollars. Robert Stewart, the surviving administrator of Nixon, was sworn, and said that when the *scire facias* was served on him, he went to Mr Kingston to see what it meant; and he told him that he need give no attention to it, as it was a mere matter of form; and that he had never employed Mr Mountain or any one else to appear for the administrators. David Wilson, the plaintiff in the judgment, was also sworn, and said that the judgment had been paid, and that S. Kingston had never been employed by him to procure its revival or collection: that Mountain had once mentioned the subject of the judgment to him, but he gave him no authority over it. The plaintiffs below were purchasers from the heirs of William Nixon in 1833, and contended that the judgment was fraudulent and void, and the sale upon it to S. Kingston, who was a party to the fraud, was void, and all subsequent conveyances were void; and that the lien of the judgment was lost by lapse of time, and the title was vested in the heirs of Nixon.

The court below (Shaler, president) instructed the jury that although the judgment, execution and sale of the property to S. Kingston would be void as to him, yet that it was good as to the defendant, who was an innocent purchaser without notice. And on the subject of the lien of the judgment, the court instructed the jury thus :—

"We now come to Murphy's title. Is he affected if he had no notice of the irregularity or alleged fraud in the proceeding? Let me first look to the lien. Before the statute of 1797, it was indefinite both against heirs and purchasers. The case in 1 *Watts* has reference only to debts not of record, not to those of record. Whose are lands in Pennsylvania after the death of the ancestor? They belong to the heirs after the payment of debts; they belong to the creditors until then, just as much as though they had been devised subject to the payment of debts. All claims were of indefinite duration until the act. They are now limited in certain cases. Is this one of the cases? I am clear it is not. Suppose a devise had been made to pay debts in England, and at the end of certain years, a bond debtor had come in for his debt; would a chancellor have postponed him for the benefit of the heir or devisees? It is clear he

IV.—3 D

would not.   How far, in case of alienations by the heirs, the purchaser would be protected, we are not called upon to say.   I here state distinctly, that where a judgment is of record at the time of the decease of the ancestor; a *scire facias* issued nineteen years after the date, and judgment obtained thereon, and sale made, divest the title of the heirs.   There is nothing, then, in this point, taken unconnected with others, that affects the title of Murphy."

*Burke*, for plaintiff in error, contended, that by the law of Pennsylvania, as settled by repeated decisions, the lien of the judgment was gone, and a sale of the land did not divest the title of the heirs who were *quoad hòc* purchasers.   Fryhoffer *v.* Busby, 17 *Serg. & Rawle* 121 ;  Kerper *v.* Hoch, 1 *Watts* 9 ;  Penn *v.* Hamilton, 2 *Watts* 53 ; Downey's Appeal, 2 *Watts* 297.

*Livingston* and *Biddle*, for defendant in error.   The merits of the original judgment are not inquirable into, and the court below were right in sustaining the sale, even upon a fraudulent judgment.   Cardesa *v.* Humes, 5 *Serg. & Rawle* 65 ; Benton *v.* Burgot, 10 *Serg. & Rawle* 240 ; Blythe *v.* M'Clintie, 7 *Serg. & Rawle* 341 ; 3 *Cranch* 307.   This being a judgment in the lifetime of the decedent, was such claim at his death as the intestate laws provide shall be a lien: it was notice to the heirs of the existence of the debt such as the law provides that a creditor shall give.

The opinion of the Court was delivered by

Huston, J.——It is but a small matter in such a robbery as this case presents, whether the debt of 60 dollars had been paid once or twice, before the proceedings on the *scire-facias*, which have ended in taking from the heirs of Nixon their whole property, and putting it in the pocket of one who had no claim on them or their ancestor.

Clearly, *if the actors in this business were the owners of the pro*perty now, it would be recovered by the heirs, without inquiring very minutely whether the transaction was the effect of the most gross negligence or of a design to defraud.   And it has been with some difficulty that I could bring my mind to agree, that an innocent purchaser for full consideration can hold it; and I do say, that I would have come to that conclusion, if it had not been in full proof, that the *scire facias* in 1827 was served on the administrator of Nixon, returned served that there was an appearance by an attorney (now dead and who cannot state why he appeared), and, as we see by the record, a regular and public sale.   I do not see how Murphy could be required to look further than this.   A fraud practised under the forms of law, is at least no better than if it had assumed another dress.   Still, the sheriff was guilty of no trespass in executing the writ, and Murphy of no negligence ; for he was not bound to look further than a regular judgment after notice and appearance, and a regular sale.   In 4 *Johns. Chan.* 247, the chancellor held the sales to those concerned

[Fetterman v. Murphy.]

void in a similar case, but intimates, in page 247, that an innocent purchaser may be safe; so also, 3 *Cranch* 307; Lazarus v. Bryson, 3 *Binn.* 54. But another point has been made, and the court are expressly called on to give an opinion on it. It is contended, that under the act of the 4th of April 1798, the lien of the judgment is not only lost, if the judgment is not revived within five years; but that in cases where the defendant in the judgment has died, and the judgment has not been revived within twelve years, the lands descend to the heirs, discharged from the debt; and that a levy and sale of such lands in such a judgment revived after twelve years by *scire facias* against executors, gives no title to the purchaser, any more than would be given by a levy and sale of lands the property of a stranger, to which the debtor never had any claim.

When the act of the 4th of April 1798 was passed, it introduced a considerable change in the effect, or rather the continuance of the effect, of judgments, and was the subject of much animadversion; but I never heard that its provisions were not plainly expressed. The object of those opposed to it was at first to limit and restrain its effect, and to evade its operation. Thus in Young v. Taylor a *dictum* was thrown out, which ripened into decision, that an execution issued and levied superseded the necessity of a *scire facias*, a stay of execution on the judgment suspended its effect for the time of stay, &c. The circuit court of the United States decided in 1807 that it applied *only to purchasers,* and not to subsequent judgments. In Bank v. Fitzsimons, 3 *Binn.* 342, this court decided that it extended not only to purchasers, but to all subsequent liens; and from that case to the present it has not been a matter of contest in court, except where a purchaser or subsequent lien claimed against the unrevived judgment. But it is now contended, in direct opposition to the contemporaneous and continued construction for thirty-seven years, that it has no peculiar reference to purchasers or liens, but applies to cases where neither exist; in other words, that if the judgment has not been revived, the lands are discharged, at least in the hands of executors and heirs. This, if true, must go further. The act directs the *scire facias* to be served on the defendant or his feoffee, or his *heirs, executors or administrators, or his or their feoffees,* that is, on the feoffee of the heir or of the executors who have sold; and the enacting clause is general, "*no judgment* hereafter entered in any court of record, &c.;" it does not distinguish between judgments against executors and judgments directly against the debtor; and until now I never supposed, and no court (unless Penn v. Hamilton is an exception) ever decided that there was a difference. In that case, the counsel for the plaintiff first contended, that because the act of 1797 limited the lien of debts against the estate of deceased persons, therefore the act of 1798 could not limit the lien of judgments against estates of deceased persons, or at least, that we must reject plain and positive words to restrain the act from extending to the latter. I have not yet heard, however, any reason why the inconveniences which

[Fetterman v. Murphy.]

called for the enactment of the law, are not as great in case of judgments obtained against executors, and which bind the estate of a decedent, as in case of judgments against the deceased in his lifetime. But it is said the word purchaser is not in the enacting clause, and this is true ; but it would have been surplusage to have put it there. A debt against a man is one thing, it gives a right to sue him and collect the amount from him ; but it is no *lien* on his real or personal estate. After suit is brought, and judgment is obtained, the creditor has not, until execution, any right to the property, real or personal, of the defendant, but his claim is so far changed, that the debtor cannot give a title to the real estate in the county in which judgment is, clear of this judgment. Whoever took this land from the defendant, after judgment, took it subject to be levied on and sold for this judgment. This liability is called the *lien* of the judgment creditor—it continued for twenty years ; the act in question limited that *lien* on all judgments to five years, unless revived. The act does not operate on the judgment, but on the *lien* ; that is, on the right to follow the lands and take satisfaction out of them, though such proceeding may affect those who have acquired an interest in them after the judgment. This right to follow the lands and take the proceeds of them from those who have acquired an interest in them after the judgment, is what is affected by the act of 1798. The word purchaser was not introduced, because it would have limited the operation and benefit of the act to purchasers, and have excluded from its benefits those who, though not strictly purchasers, had acquired some interest in, or lien on, the land after the judgment. " No judgment shall continue a lien," &c., then has no relation to the defendant in the judgment ; it leaves the rights of plaintiff, as to him, precisely as they were before 1798 ; but it limits the right of a creditor (unless he revives his judgment according to the act and its supplement) to five years, as respects those who purchase or acquire subsequent liens on lands bound by the judgment.

In the case of Penn *v.* Hamilton, there was no judgment against the debtor in his lifetime. The first judgment was in a suit against his executors. This may be said to distinguish it from the present : for myself, as at present advised, I do not see how that can make any difference.

But further ; those judgments were entered on the 8th of January 1807 ; revived by amicable *scire facias* the 29th of December 1812 : and a *scire facias* issued, to continue the lien, to November 1821. In the meantime a sale of the lands was made, and a second sale of part. The case did not call for an opinion as to the case of no intervening right : it might be sufficient to say this much, but I will add that I do not understand that the Chief Justice intended to be understood as going that length, or contemplated what was said by him as going to the extent now contended for. It is one thing to decide to whom the money shall go on a sale on execution, and another to say that the sale on regular, legal process is void, though made, or since trans-

[Fetterman v. Murphy.]

ferred, to an innocent purchaser : at present, the court only decide the case before them.    The effect of the act of the 4th of April 1798 is not, in this case, sufficient to avoid this sale, now that the title has passed to an innocent purchaser, who is admitted to have paid a full consideration at the time of his purchase.

GIBSON, C. J.—It is proper to add that we entertain not a doubt of the doctrine in Penn *v.* Hamilton.    In that case, to prevent the mischief which springs from liens of unlimited duration, we infused into the act of 1797 for limiting the lien of a decedent's *debts*, principles borrowed from the act of 1798 for limiting the lien of *judgments*, because the direct provisions of the latter could not be applied to judgments which have no lien to be limited ; and such are judgments obtained against the representatives of a decedent, as appears in Wootering *v.* Stewart, 2 *Yeates* 483 ; Scott *v.* Ramsay, 1 *Binn.* 221 ; Prevost *v.* Nichols, 4 *Yeates* 487, and Trevor *v.* Ellenberger, 2 *Penns. Rep.* 96.    " This," it was said in Prevost *v.* Nichols, " appeared to accord with the policy of the government from the earliest times ; and it made no difference to creditors whose lien *attached only at the death* of the testator or intestate, whether the assets arose from the sale of real or personal estate."    In Trevor *v.* Ellenberger, it is explicitly said, that a judgment against an executor or administrator gives no new or additional lien ; and if it be not said so pointedly in the other cases, it is sufficiently intimated by saying that a decedent's land is a subsidiary fund, on which the rights of his creditors are fixed at his death.    It is, in truth, a chattel for payment of his debts ; and to that end, a judgment against his representatives may be used to turn it into cash but not to acquire a lien on it more than on any other chattel in respect to which the doctrine of lien is not predicable.    If a special or separate lien could be obtained against his heirs or devisees, why not also against the other creditors ?    The first is unnecessary, because the debts are sufficiently secured without it by the general lien established in Graff *v.* Smith, 1 *Dall.* 481 ; and the second would break in on the established order of payment.    In Penn *v.* Hamilton, we did but treat the judgments as having been unattended with lien all along ; and to the independent lien of the debt we but applied the principle of Kerper *v.* Hoch, 1 *Watts* 9, which puts volunteers, under the act of 1797, on a footing with purchasers and creditors ; a principle not introduced into the construction of the act of 1798, as is apparent in the opinion just delivered, the effect of which, in respect of the doctrine of Penn *v.* Hamilton, without a word of explanation, might be misapprehended.

Judgment affirmed.