IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

PHILADELPHIA—JANUARY TERM, 1876.

## Rector, &c., of the Church of St. Bartholomew, *versus* Wood *et al.*[1]

1. An act by one not *sui juris*, which amounts only to a recognition of a liability already imposed, will be sustained.

2. Although no fresh contract liability may be created, and any waiver of a party's right in original process may be absolutely prohibited, yet any step may be taken to facilitate the execution of *mesne process* to which a final judgment has declared the party to be subject.

3. The charter of a church prohibited the corporation from disposing or encumbering their real estate without the assent of the convention or standing committee of the Episcopal Church of Pennsylvania; judgment was recovered against the corporation. *Held*, that if duly authorized, legal formalities in the execution might be waived.

4. The acknowledgment of a sheriff's deed raises the presumption that the statutory requisites for notice to the parties have been complied with and the presumption must prevail until rebutted by satisfactory proof.

5. Judgment was recovered against a church; inquisition and condemnation were waived, the waiver being signed by officers of the church, with the corporate seal, without authority; the real estate was sold under the fi. fa.; the purchaser afterwards conveyed to Wood, who had no knowledge of the defects in the waiver, and the rector and officers of the church had notice of the sheriff's sale before the conveyance to Wood. The church continued in possession after the sheriff's sale, the rector delivered the key to Wood after his purchase and obtained his permission to occupy it for one Sunday and then delivered possession. Wood expended large sums of money in

---

[1] A motion for re-argument was made in this case and was overruled October 30th 1876.

repairing the building. *Held,* that notwithstanding the invalidity of the waiver, the corporation was estopped from recovering the property from Wood.

January 5th 1875. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Error to the District Court of *Philadelphia:* Of January Term 1873, No. 25.

This was an action of ejectment brought to December Term 1865, of the court below by the Rector, &c., of the Church of St. Bartholomew against James F. Wood, Bishop of Philadelphia, and Edward McCann, who was tenant of Wood, for a lot of ground bounded by Seventh and Eighth streets, York and Church streets, in the city of Philadelphia; there being a church building erected thereon.

The case had been before tried and a verdict rendered for the defendants, the judgment on which was reversed by the Supreme Court, and a venire facias de novo awarded. It is reported in 11 P. F. Smith 96.

The plaintiffs were incorporated December 8th 1849, by the Court of Common Pleas of Philadelphia. The 4th sect. of the charter provided : " The said corporation shall not by deed, fine or recovery or by any other means without the assent of the convention of the Protestant Episcopal Church of the state of Pennsylvania, or of the standing committee of the diocese, previously had and obtained, grant, alien or otherwise dispose of any lands, messuages, tenements or hereditaments in them vested, nor change or encumber the same to any person or persons whomsoever."

The premises in dispute were conveyed to plaintiff by parties owning the estate of Joseph P. Norris, deceased. The plaintiffs had given three mortgages to the trustees of that estate, amounting together to $4250 principal; the interest until May 20th 1865, made the whole mortgage debt about $7500.

On the day last named an amicable action, in which John Gibson was plaintiff and the Church was defendant, was entered in the District Court of Philadelphia, and judgment was confessed in favor of the plaintiff for $361. Gibson's claim was on a certificate of indebtedness given him for a debt contracted in building the church. The agreement for the action and confession of judgment was signed, " N. M. Jones, Rector," and " Geo. M. Taylor, Warden," with the corporate seal of the church.

On the 13th of June 1865 a fi. fa. was issued on this judgment; accompanying the fi. fa. was the following :—

" The defendant waives any inquisition and condemnation and requests the sheriff to sell under this writ.

For church, ISAAC NORRIS,
[CORPORATE SEAL.]                        GEO. M. TAYLOR,
Churchwardens."

[Rector, &c., of St. Bartholomew *v.* Wood.]

The property was sold to James Otterson, Esq., for $200, subject to the mortgages, and conveyed to him by the sheriff on the 8th of July 1865. On the 29th of September, Mr. Otterson conveyed to Bishop Wood, who went into possession and has continued in possession by his tenants ever since.

The plaintiffs, alleging that the sheriff's sale was void, the waiver of the inquisition having been by persons who had no authority to make it, brought this ejectment.

The case was tried January 8th 1872, before Thayer, P. J.

The plaintiffs gave in evidence their original title to the premises and closed.

The defendants gave in evidence the judgment of Gibson; fi. fa.; waiver; sheriff's sale and conveyance by the purchaser to Bishop Wood, as above stated, and closed.

The plaintiff in rebuttal called George M. Taylor, who testified that in 1865, he was the accounting warden of St. Bartholomew's Church; John C. Mitchell in 1865 was the rector's warden; Isaac Norris was never a warden of that church; the secretary of the vestry was George Hookes.

The rector Mr. Jones and Mr. Hookes were dead. Witness had no authority from the church to sign the waiver of the inquisition. The vestry made no application to the standing committee of the diocese as provided by the charter. Mr. Norris brought the waiver to witness and asked him to sign it; Norris said it was all right, it was to save the expense of a sheriff's jury. The corporate seal of the church was kept by the rector. Witness knew of Gibson's judgment and was told by Mr. Norris when he brought him the paper that the church was to be sold at sheriff's sale. Witness was financial agent of the church and he only could have paid out its moneys; the certificates of indebtedness appeared on the minutes of the vestry. There was a certificate to one Bartlett for $760 and to one Rees for $1130.83, besides Gibson's; the mortgages were for money borrowed from Mr. Norris. The certificates were signed by witness and Mr. Norris. Judgments had been recovered by Bartlett and Rees; all the certificates were signed by Mr. Norris and the witness, and the seal of the church was affixed to them. After the sheriff's sale the rector sold the organ, font and bishop's chair; upon his report to the vestry, they directed the proceeds be paid to him for his salary. The certificates of indebtedness were issued in pursuance of a resolution of the vestry of November 20th 1861, authorizing the rector and wardens to issue them; there was no authority to sign the confessions of judgment on the certificates except so far as it might be inferred from the resolution authorizing their issue.

The plaintiffs then offered to prove by J. Clayton, Esq., that he was secretary of the standing committee of the diocese and had possession of the minutes; that no application had been made and

[Rector, &c., of St. Bartholomew *v.* Wood.]

no minute appeared to authorize a confession of judgment or waiver of inquisition. This offer was objected to by the defendants, rejected by the court and a bill of exceptions sealed.

Rev. Mr. Childs, secretary of the Episcopal convention, stated that according to the church law no act could be perfected by a single member or members of the vestry; the vestry could act only as a body; " every act of theirs proceeds in the way that the resolution committing the authority authorizes it to be done; it is usual to attach the act to the resolution," it is usual when required to convey a power for the secretary to give an attested copy of the resolution authorizing the act; the acts must be done at the vestry. The warden by virtue of his office had no right to sign a waiver of inquisition; the evidence of the assent of the church to an act is the certificate of the secretary of the vestry that the act was passed. The secretary of the vestry is the custodian of the corporate seal."

The plaintiff gave evidence that Mr. Norris had never been a warden in their church; also, by the several vestrymen of the church since 1862, that they had never known of any authority given to Mr. Norris or Mr. Taylor to sign the waiver and that they had no knowledge how the seal came to be affixed to the waiver; that they had not known of the sheriff's sale until the meeting of the vestry when the proceeds of the organ, &c., were directed to be paid to the rector.

There was much evidence by the plaintiffs for the purpose of showing that the waiver of the inquisition was unauthorized and void; and that the corporate seal had improperly come into the hands of Mr. Norris.

The plaintiffs having closed, the defendants called Edward Olmsted, Esq., who, under objection and exception testified that he had made the examination of titles a prominent part of his practice; he had also been secretary of the standing committee of the diocese and had been consulted in regard to the charters of various churches; in September 1865, he was called on by Mr. Gummey, a conveyancer, on behalf of Bishop Wood, in relation to the title of the premises in dispute for the purchase of which the bishop was then negotiating, and asked for his opinion, whether there was a sufficient waiver of the inquisition, and that his opinion was in favor of the title of the sheriff's vendee. He also said that in his opinion the wardens of the church were the proper custodians of the seal, and that the secretary of the vestry was not.

James Otterson, Esq., testified that he was of counsel with Bartlett who held a certificate of indebtedness against the church similar to that given to Gibson, under the seal of the church; he had an understanding with Mr. Norris as representative of the church and afterwards there was a judgment entered in favor of his client on the 20th of May 1865 on a paper authorizing the confes-

[Rector, &c., of St. Bartholomew v. Wood.]

sion of a judgment. Witness purchased the property at sheriff's sale. The purchase was made in the name of the witness, but with an understanding between himself and Mr. Dropsie, who represented Rees, a holder of another church certificate of indebtedness, that the purchase was to be for their joint interest. Afterwards on the day (July 8th 1865) the deed was acknowledged he called on Mr. Jones, the rector of the church, in company with Mr. Taylor the warden; Mr. Jones said the sale was a surprise to him, although he had seen the sheriff's handbill on the property; witness told him all he wanted was his client's money, and if the church would pay that he would make a conveyance; that he had no wish to interfere with their possession or use of the building, but desired to have a technical possession; he asked Mr. Jones to make delivery of the key to him and to receive it back under an agreement to hold it subject to his order; this was done and Mr. Jones gave witness his receipt. In a subsequent interview with Mr. Jones in the same summer, he said nothing had been done as to the payment of witness. At that interview witness and Mr. Jones spoke about Bishop Wood desiring to purchase the property. The bishop paid $15,000 clear of everything; the money was paid by Mr. Gummey; the bishop and Mr. Norris were also present; the amount due on the mortgage was paid to Mr. Norris and the balance of the purchase-money was paid to the witness; the deed was delivered to the bishop by witness; witness had no connection with the bishop or Mr. Norris before the sheriff's sale.

On cross-examination witness said that during the negotiation for the sale to the bishop, Mr. Gummey expressed doubts as to the sufficiency of the waiver of the inquisition and it was agreed that Mr. Olmsted's opinion should be obtained.

Mr. Dropsie testified that he had seen the waiver and was of opinion that it was all regular. Mr. Norris came to witness on behalf of the church and asked for indulgence.

Bishop Wood testified that his attention had been called to this property as a suitable one for a church and he thought of making the purchase, but before purchasing inquired as to the title and encumbrances; he was informed that the title was good; he employed Mr. Gummey, who said there was a difficulty about the title; it was then referred to Mr. Olmsted and the occurrences took place as stated by Mr. Otterson. Mr. Otterson gave witness an order on Mr. Jones for the keys, who delivered them to him and at his request witness allowed the congregation to occupy the church on the next Sunday. It had been agreed that the organ, &c., were not included in the purchase; all but the organ were afterwards purchased by witness. After the Sunday had passed the keys were delivered by the rector to the witness about the beginning of October. The church was in very bad repair throughout; witness paid about $5000 for repairing it. About the 26th

[Rector, &c., of St. Bartholomew *v.* Wood.]

of November witness gave notice that the church would be dedicated, and on the same day he received a notice from Mr. Sharpless, plaintiff's attorney, not to go on with the dedication, as the title would be contested. Mr. Jones never said anything to witness about the title, but expressed regret that the property had been sold.

Isaac Norris, Esq., testified that he was one of the vestrymen of the church; the certificates of indebtedness were drawn by witness, and he put the seal to them; the seal was in his possession, having been handed to him by a preceding treasurer; witness put the seal to the confession of judgment and the waiver; the waiver was in the writing of the clerk of witness; the seal had been in his possession for thirteen years; he took an active part in the management of the property. Mr. Jones, Mr. Taylor and himself had the controlling management and direction of the church. Two of the holders of the certificates of indebtedness were pressing their claims; witness informed Bishop Potter and Mr. Jones of the pressure; they promised to make efforts to raise the money to pay at least the interest; no money was raised and Rees put his claim in suit; witness told Gibson that all three should be on an equality; the confession of judgment was drawn to be entered the same day with other judgments. There was no formal resolution authorizing the witness to put the seal to the papers, but it was done with the knowledge, consent and approbation of Mr. Jones and Mr. Taylor.

Edward Waln, Esq., testified, that he had been of counsel with the church and had received his instructions from Mr. Jones. When the suits were brought witness was authorized to raise money to discharge the claims, but was unsuccessful; he explained to Mr. Jones that if the sale should go on under Mr. Dropsie's judgment the property would be sold in August, when there would be few bidders in the city, and witness suggested that the inquisition should be waived; witness drew the papers to be executed according to the rules of the church, of which witness was ignorant. Gibson told witness to do as he pleased, he would incur no trouble or expense; if the church wished to use his name to effect a sale they were at liberty to do so.

There was much evidence by both parties in support of their respective positions.

The plaintiffs' points were :—

1. If the waiver of an inquisition on the fieri facias given in evidence by the defendants in this case was made without the authority of the plaintiffs, the sale made on the said fi. fa. was void, and the plaintiffs are entitled to the verdict.

2. There is no evidence of any authority on the part of those who executed said waiver of inquisition to bind the plaintiffs thereby.

3. In order that an equitable estoppel should be created against the plaintiffs in this case, it should appear that any acts of the plaintiffs subsequent to the acknowledgment of the sheriff's deed which are relied on to create said estoppel should have been done by them with a knowledge of the fact that their church had been sold without authority of law.

The first and third points were refused and the second affirmed.

Judge Thayer, after stating and discussing the evidence, said :— * * *

"There has been a very large amount of testimony given in this case, but I think it will be found that its decision depends principally upon two points : 1. Was there any waiver of inquisition on the part of the plaintiffs, who were the defendants in the execution ? 2. If there was no waiver of inquisition, are the plaintiffs estopped by their subsequent conduct from setting up that defect of title against the defendants ?

"I think the case will be found to turn upon the decision of these two points.

"First, as to the waiver. Undoubtedly the law requires, before real estate can be sold by the sheriff under an execution, that the property shall be condemned by a sheriff's jury; if the sheriff undertakes to sell any man's real estate without condemnation, it is an unlawful sale, and unless some good answer can be given to the objection, it is fatal to the title thus acquired. The law requires a condemnation, and unless the defendant in the execution waives the condemnation, the sheriff has no right to sell, and his sale is without authority of law. Undoubtedly, in this case, there was no inquisition or condemnation. But there was an alleged waiver of inquisition. One of the important questions in the case, therefore, is whether there was any lawful waiver of this inquisition. That depends upon the question whether the persons who undertook to do that act had lawful authority to do it. The persons who signed this instrument were Mr. Taylor, the accounting warden of the church and Mr. Norris, who was not a warden, but a vestryman. Had they any authority to do it ? After the most careful examination of the testimony, I do not see any evidence in the case whatever that they had any express authority to perform that act. I think that it sufficiently appears in the evidence that the body which was charged with the protection of the rights and interests of this corporation, and with the control of its property, was the vestry of the church. * * * If then there was a total absence of any express authority from that body which had the control of this subject, we are next to inquire whether the persons who executed this waiver of inquisition had any authority to execute it by virtue of the offices which they held ? Mr. Norris was a vestryman. As one of the vestry, had he a right to assume the functions which belonged to all the vestrymen ? or to a quorum of

30 P. F. Smith—15

the vestry ? What right one of the vestry has to take into his keeping the whole property of the church and to execute papers which are to dispose of its property and its rights, it is difficult for me to see. If Mr. Norris might have exercised this right because he was a vestryman, then any other single vestryman might have done the same thing. I do not see from the evidence that a single vestryman has any such authority. Had Mr. Taylor any authority to do it because he was not only a vestryman but a warden ? Has a warden any authority by virtue of his office, and without any express delegation of authority from the vestry of the church, to sign an instrument of this character and to bind the corporation by it?

" I do not understand that any such power or any such functions pertain to his office. So far as I can see from the evidence I do not understand it to be a part of his official duty to sign any instrument that he may choose to bind the corporation of the church. It would certainly be a very dangerous authority to delegate to any one member of the vestry if that body is, what I suppose it is intended to be, the guardian of the corporation which it represents.

" I feel it to be my duty to say that I do not see that either of these individuals had any express authority from the corporation to execute this paper, or that they had any such authority by virtue of the offices which they held.

" It is true that the corporate seal was affixed to this paper. If that was done without authority in fact or authority of law, would it make it a valid and binding instrument ? I am obliged to answer that question in the negative, because the fact that the corporate seal is affixed to a contract, or conveyance does not render the instrument a corporate act, unless it is affixed by an officer or agent of the corporation duly authorized. Undoubtedly the seal itself is primâ facie evidence of authority. If nothing more appears than the seal, that is conclusive. The law will infer an authority from the seal upon the paper, but if it be shown that the seal was affixed without authority, then the mere affixing of the seal does not bind the corporation.

" Nor has any member of the corporation the right to affix the seal of the corporation to the instrument because he is the custodian of the seal. The very term implies that he is to keep the seal; he is to guard it, not to use it. It would be a most perilous rule to establish that a man who is intrusted with the safe-keeping of the seal of a corporation might use that seal without the consent or authority of the corporation, and bind it by its use in a manner which might sweep away all the corporate property. There is no such rule of law that the affixing of the seal of the corporation to an instrument by its custodian, without authority, binds the corporation. It is the duty of people to ascertain that

[Rector, &c., of St. Bartholomew *v.* Wood.]

authority and to inquire whether the affixing of the seal upon instruments has been authorized by the corporation.

" If, therefore, in this case, Mr. Norris and Mr. Taylor had no express authority, and no authority by virtue of their offices, to bind this corporation by this instrument, they had no right to execute the instrument, and, of course, the corporation would not be bound by the instrument.

" If the case ended there, it appears to me it would be a very plain case for the plaintiffs ; but the case by no means ends there, for just at this point other circumstances arise of the most material character.

[" It is shown that the rector of this church knew all about this sale ; that there were persons connected with the church who also knew all about it ; that the vestry knew it because they appropriated the proceeds of the sale of the church furniture to the payment of the rector, which I think clearly shows knowledge of the sale. It also appears that the defendant was put in possession of the property without any question of his title.

" Possession was insisted upon by the conveyancer whom the defendant retained to protect his interests, and possession was accordingly given to him when he paid his money. There does not appear to be the least reason to suspect that Bishop Wood dreamed of anybody setting up a title against him. He had, it is true, an intimation from Mr. Gummey of a doubt with regard to the regularity of the waiver of inquisition, but that doubt had been removed by consultation with counsel. Advice of counsel, if erroneous, would not be any protection of his title or any addition to it. The evidence of it was admitted only for the purpose of showing that the defendant acted in good faith.

" Had not the defendant a right to suppose that the former owners of the property, who had transferred to him the possession of the property, had waived any claim which they might have, to set up this defect in the title ? Can the plaintiffs be permitted to stand by and see the defendant pay down his $15,000 for the property, put him into possession, allow him to remain in possession two months, expending $4000 or $5000 more in repairs, and then set up this defect in the proceedings to defeat his title ?

" Upon this point I think I am bound to give you as explicit an instruction in favor of the defendant as I gave you in favor of the plaintiffs on the other point.

" If you believe that the plaintiffs gave possession to the defendant and that he paid his $15,000 upon the faith of his title, and if you believe that the defendant went into possession and expended large sums of money in the improvement and repairs of the property, and remained in possession until the 25th of November without his title being challenged, then your verdict ought to be for the defendant. Because by such a course of conduct the plain-

[Rector, &c., of St. Bartholomew *v.* Wood.]

tiffs are estopped from setting up this defect for the purpose of overthrowing the title which, by their own acts, they have confirmed."]

The verdict was for the defendant.

The plaintiffs took a writ of error and assigned seven errors :—

4. The admission of the testimony of Edward Olmsted, Esq.

5, 6. The refusal of their first and third points.

7. The part of the charge in brackets.

*N. H. Sharpless* and *W. H. Rawle,* for plaintiffs in error.—The limitations imposed by corporations by their charters against alienation cannot be removed by the application of the doctrine of estoppel. Such restraint is found in the 4th section of their charter. The waiver was made without their authority and was void: Baird *v.* Lent, 8 Watts 422 ; Gardner *v.* Sisk, 4 P. F. Smith 506 ; St. Bartholomew's Church *v.* Wood, 11 Id. 96. No right can spring from a void act: Glidden *v.* Strupler, 2 P. F Smith 400. If authority to do an act does not expressly appear in the charter, it is notice to all the world that it does not exist: Pennsylvania Railroad Co. *v.* Canal Com'rs, 9 Harris 22 ; Pearce *v.* Railroad Co., 21 How. 443. When a corporation exceeds its charter powers the doctrine of estoppel does not apply: Hood *v.* N. Y. & N. H. Railroad Co., 22 Conn. 502 ; Pennsylvania Co. *v.* Dandridge, 8 Gill & Johns. 248 ; Treadwell *v.* The Commissioners, 11 Ohio St. 183. An act void for want of power cannot be made valid through the doctrine of estoppel: Duchess of Kingston's Case, 2 Smith's Leading Cases 648 in *notis ;* Herman on Estoppel, sect. 540 ; Bigelow on Estoppel 461 ; 2 Parsons on Contract, sect. 340 ; Angell & Ames on Corporations, sect. 256. As analogous to this is the case of a married woman who cannot be estopped from asserting her want of power : Williams *v.* Baker, 21 P. F. Smith 476 ; Keen *v.* Coleman, 3 Wright 299 ; Glidden *v.* Strupler, *supra ;* Swayne *v.* Lyon, 17 P. Smith 436. On the general subject of equitable estoppel they cited Commonwealth *v.* Moltz, 10 Barr 527 ; Wissler *v.* Hershey, 11 Harris 333 ; Beaupland *v.* Keen, 4 Casey 124 ; Newman *v.* Edwards, 10 Id. 32 ; Brubaker *v.* Okeson, 12 Id. 519 ; Woods *v.* Wilson, 1 Wright 379 ; Ream *v.* Harnish, 9 Id. 376 ; Pickard *v.* Sears, 6 Ad. & E. 469 ; Reel *v.* Elder, 12 P. F Smith 308 ; Rhodes *v.* Childs, 14 Id. 18 ; Lawrence *v.* Luhr, 15 Id. 236 ; Meason *v.* Kaine, 17 Id. 126 ; Smith *v.* McNeal, 18 Id. 164.

*A. S. Biddle* and *G. W. Biddle* (with whom was *W. L. Hirst*), for defendants in error.—The real owner of property may be estopped from claiming it, by allowing it to be sold with his knowledge, as the property of another: Pickard *v.* Sears, 6 Ad. & E. 469 ; Stephens *v.* Baird, 9 Cowen 274 ; First Presbyterian Con-

gregation v. Williams, 9 Wend. 147; Dezell v. Odell, 3 Hill 215; Gregg v. Wells, 10 Ad. & E. 90; Niven v. Belknap, 2 Johns. 573; Gregg v. Von Phul, 1 Wall. 274; Chapman v. Chapman, 9 P. F. Smith 218. Ignorance of the legal consequences of their acts, or of the legal effect of their silent acquiescence in the acts of others will not relieve the plaintiffs from the estoppel imposed upon them: Tilton v. Nelson, 27 Barb. 595; Storrs v. Barker, 6 Johns. Ch. 169. The defendant had a right to assume that the necessary consent of the convention or standing committee had been obtained, unless there were something to put him upon his guard that this had not been done. In transactions with another I may assume, *as against him*, that where a duty is to be performed by him, as a condition precedent to the validity of the transaction, he has complied with the restriction imposed upon him: Bigelow on Estoppel 466; Carncross v. Lorrimer, 3 McQueen H. L. 827. When a corporation cannot proceed lawfully until duly organized and it proceeds to act as a corporation, it is presumed that it has been organized on the maxim that all things are presumed to have been done rightly till the contrary appear: Narragansett Bank v. Atlantic Silk Co., 3 Metc. 287; Dooley v. Cheshire Glass Co., 15 Gray 494; Webb v. Commissioners of Herne Bay, Law Rep. 5 Q. B. 642; Royal British Bank v. Turquand, 5 E. & B. 248; s. c. 6 Id. 327; Fountain v. Carmarthen Railway Co., 5 Law Rep. Eq. 522; Burgate v. Shortridge, 5 H. L. Cases 297; County Life Ins. Co.'s Case, Law Rep. 5 Ch. 288; Bissell v. M., S. & N. I. Railroad Co., 22 N. Y. 258; Life & Fire Ins. Co. v. Mechanics' Ins. Co., 7 Wend. 31; Allegheny v. McClurkan, 2 Harris 81.

Mr. Justice WOODWARD delivered the opinion of the Court, June 8th 1875.

The strain of this case begins at the very outset of its history. It was provided by the fourth section of the charter of St. Bartholomew's Church, that "the said corporation shall not, by deed, fine or recovery, or by any other means without the assent of the convention of the Protestant Episcopal Church of the State of Pennsylvania, or of the standing committee of the diocese, previously had and obtained, grant, alien, or otherwise dispose of any lands, messuages, tenements or hereditaments in them vested, nor charge or encumber the same to any person or persons whomsoever." In erecting their church building, the plaintiff incurred debts, on one of which a judgment was obtained by the creditor, John Gibson, on the 20th of May 1865. A writ of fieri facias was issued on the 13th of June 1865, to which an agreement was attached, signed "for the church" by Isaac Norris and George M. Taylor, styling themselves churchwardens, with an impression of the corporate seal of the church affixed, and waiving any inquisition and condemnation, and requesting the sheriff to sell on his writ. As to .

the facts connected with this paper, there is no dispute. It was executed without the authority of the vestry of the church; Mr. Norris, although a member of the vestry, was not a warden; and the seal was irregularly and improperly in his possession when it was impressed upon the instrument. There can be no doubt that if application had been made by the defendants in the judgment, the present plaintiffs, to the proper court at the proper time, the agreement, fabricated as it was in so exceptional a way, would have been stricken from the record. Even after the acknowledgment of the sheriff's deed, if the first purchaser had retained the property, it is probable that the hands of court would have been laid upon the process on the ground that irregularities so gross would be held to amount to fraud. The position of the defendants, however, is far in advance of this. The land was sold to James Otterson on the 3d of July, and the sheriff's deed to him was executed on the 8th of July 1865. On the 25th of September 1865, Mr. Otterson sold and conveyed the property to Bishop Wood. The ground is taken that the defect in the record was vital, and of a nature to defeat the title in the hands of a purchaser for a valuable consideration without notice, because the waiver was a step in the alienation of the property, and the charter restrictions by which the power of the corporation was fettered forbade that any such step should be taken. The first and most material question, therefore, is whether this agreement, if it had been duly made, was within the scope of the corporate authority. If not, the grantee of Otterson can assert no equity under the alleged acquiescence of the plaintiffs, for the record of the charter was notice of its provisions to all the world, and the entire proceeding was simply void. If the act, legally performed, was *intra vires*, as the instrument was regular on its face, the defendants would seem entitled to the ordinary rights of an innocent purchaser, and the plaintiffs would seem subject to the ordinary principles of equitable estoppel. Under the facts admitted, and the facts found by the jury, it is manifest that the determination of this question is the determination of the cause.

The general theory of the plaintiffs is, that in view of their charter disabilities, they were not *sui juris*, and that for any purpose of alienation or encumbrance of their property, they held the precise position which a married woman holds in relation to her estate. Adopting the analogy thus suggested as apt and accurate, it is necessary to ascertain the exact rule deducible from the authorities as to the power and disabilities of parties not *sui juris* in Pennsylvania. It has been held that a parol partition of lands between tenants in common who derive their title by descent, when fair and equal, and followed by a due execution of it, is binding upon all, whether they be femes covert, their husbands joining them, or minors, with the assent of their guardians or not: Calhoun *v.*

[Rector, &c., of St. Bartholomew v. Wood.]

Hays, 8 W. & S. 127. An agreement by feme covert making partition of her real estate, is binding without a separate examination and acknowledgment: Peter Rhoads's Estate, 3 Rawle 420. In Wightman's Appeal, 5 Casey 280, a wife had not only given her separate bond with confession of judgment for purchase-money of lands, but had confessed a separate judgment for the price of materials furnished and work done for its improvement, and in the distribution of the proceeds of the sale of the land, the fund was applied, after payment of the purchase-money lien, to the lien of the creditor by whom the improvements had been made. A peculiarity of the same case was, that the wife alone waived inquisition and confessed condemnation in ·the execution on which the land was sold. A married woman bought land, received the deed and gave a bond and mortgage in her own name alone for the balance of the purchase-money, to be paid on the death of two annuitants, to whom the interest was to be paid annually during life. By a condition in the bond, the principal could "be collected as if fully due" on default for six months in paying the interest. It was held that upon such default the principal could be collected by suit on the mortgage: Glass v. Warwick, 4 Wright 140. Brunner's Appeal, 11 Id. 67, was a case in which Magdalena Byler, a single woman, had executed a judgment bond to Owen B. Good. After her marriage, it was entered against her in her maiden name on the 7th of November 1855, and was revived by the agreement of herself and her husband on the 9th of February 1860. After a sale of her estate under an order of the Orphans' Court, the amount of his judgment was distributed to Mr. Good, the court deciding that the wife was competent to execute the agreement to revive it. A married woman, her husband not joining, conveyed her land to Levick, who went into possession; she and her husband afterwards conveyed to Brotherline for $500, on the representation that he was perfecting the title of Levick. In the opinion of WILLIAMS, J., it was held that if the grantors executed the deed of relying on the representations, it was void, notwithstanding the money consideration, and that in an ejectment for the land by Brotherline against Levick, the latter could set up the fraud in avoidance of the deed: Levick v. Brotherline, 24 P. F. Smith 149. The general result of the authorities would seem to be that an act by a party not *sui juris* will be sustained, which amounts only to a recognition of a liability which the law has already imposed. Although no fresh contract liability may be created, and any waiver of the party's rights in original process may be absolutely prohibited, yet no legal principle and no rule of public policy forbids any step that may be taken in facilitating the execution of mesne process to which a final-judgment or decree has declared the party to be subject.

In the present case, the judgment was in existence. It was

competent for the plaintiffs to waive legal formalities in the execution, and if the waiver, which was in due apparent form, had been duly authorized, the validity of the entire record would have been free from doubt.

The actual facts relating to the execution of the waiver of the inquisition, established the absence of all authority in the persons who signed it, the improvident use of the corporate seal, and the assumption by Mr. Norris of an office whose functions he had no right to exercise. As to the plaintiff in the judgment, the sale on application would have been set aide. As to the purchaser, if he were defendant here, it may be assumed for present purposes that he would be affected by the defect of process. But the relation to the record which Bishop Wood, who had been neither party nor privy to it, acquired by his purchase of the property, was widely different from that borne either by the plaintiff in the judgment or the purchaser at the sheriff's sale. The agreement for the sale on the fieri facias was on its face free from all indications of defect. It was one which the church authorities were competent to make; Mr. Taylor, who signed it, was actually a warden, and Mr. Norris was described as one; and it was stamped with the genuine seal of the church, which implied, primâ facie, antecedent authority for its use. Without notice, or means of knowledge, or the existence of facts to suggest the duty of inquiry, Bishop Wood was bound to look no further. It has been held that a person who effects a policy of insurance with a life assurance company in the ordinary course of business, is not bound to inquire whether the persons signing the policy as directors have been legally appointed directors, or are empowered to use the seal of the company: County Life Assurance Co., Law Rep. 5 Ch. 280. Looking at the transaction in its worst possible aspect as a contrived and premeditated fraud, the purchaser, who was ignorant of it, would be still protected. Fetterman *v.* Murphy, 4 Watts 424, and Irwin *v.* Nixon's Heirs, 1 Jones 419, in both of which cases the same title was involved, decided that a sheriff's sale of an intestate's land on a judgment fraudulently obtained, to the attorney who obtained it, was void as to the owners; but if it had been subsequently conveyed to an innocent purchaser, he would not be affected by the fraud, and would have a good title.

The record in this case establishes two facts incontestably: that when the conveyance was made to Bishop Wood, he had no knowledge of the defect in the waiver, and that the plaintiff had at that time had notice of the sheriff's sale. The first of these facts is a direct result of the verdict, for without it, as the cause was tried, that could not have been rendered. The second fact is to be inferred from the acknowledgment of the sheriff's deed apart entirely from the general finding of the jury, and from the evidence, which was undenied, that the possession of the church building had been

surrendered to Mr. Otterson, and that the key was in his hands. It is true that the acknowledgment by a sheriff of a deed executed by him is not such *res adjudicata* as precludes an inquiry into the legality of the proceedings by which the sale was made: Braddee *v.* Brownfield, 2 W. & S. 271. And the absence of authority, or the presence of fraud, utterly frustrates the operation of a sheriff's sale as a means of transmission of title, and may be insisted on after the acknowledgment: Shields *v.* Miltenberger, 2 Harris 76 ; while Spragg *v.* Shriver, 1 Casey 284, might justify some doubt on the question in the case of a sale under a venditioni exponas, it is clear that an acknowledgment will not cure the want of a sufficient inquisition or a waiver of it in the case of a sale under a writ of fieri facias: Gardner *v.* Sisk, 4 P. F. Smith 506. But it cures all defects of the process or its execution which the court has power to act upon: Thompson *v.* Phillips, 1 Bald. 246, and mere irregularities of every kind: Blair *v.* Greenway, 1·Browne 219.

It is sufficient to raise the presumption, in the first instance, that the statutory requisites for notice to parties have been complied with, and this presumption must prevail until it is rebutted by satisfactory affirmative proof, and no such proof was given here. From the 8th of July to the 25th of September 1865, these plaintiffs had acquiesced in the disposition of the property which had been made by the sheriff's sale. The validity of the judgment had not been assailed, and the regularity of the execution process had not been questioned. They knew their title had passed to Mr. Otterson, and they suffered him to transfer it to Bishop Wood without objection or remonstrance. It is claimed that the rights of the defendants must rest on the facts existing at the time when Mr. Otterson's deed was delivered, and that the defence of estoppel cannot be helped by acts done subsequently by the plaintiffs. It is not necessary to enter on the discussion of this claim. It is enough to say that the evidence of the subsequent acts was legitimate, for they were done by the parties who were directly in interest, and in relation to the subject-matter of the controveisy, and the evidence tended to throw light on the facts actually existing when Mr. Otterson executed and delivered his deed. If a reasonable motive for it existed, there had been reasonable time for action. Acquiescing as the plaintiffs did up to and long after the purchase by Bishop Wood, of what was apparently an unimpeachable title, they have no right in law, equity or good conscience to mantain a claim to the property now.

There is nothing shown by the report of this case in 11 P. F. Smith 96, that is in conflict with the conclusion which has been reached. Evidence had been offered on the first trial in the court below to show that the waiver of inquisition had been signed by persons who had no authority to act for the corporation, and that the paper purporting to be a waiver was fraudulent and void. All

[Rector, &c., of St. Bartholomew *v.* Wood.]

that was decided was, that the evidence was admissible. All questions as to the effect on the rights of the parties of the facts which the jury have now found, were expressly reserved in the opinion of the court.

It is objected that the view that has been taken of the questions presented is a departure from the principles adopted in disposing of the cause in the court below. But is not the objection more formal than substantial? All the facts relating to the waiver of the inquisition are on the record. They were not controverted on the trial, and are now asserted by both parties. The knowledge by the plaintiffs of the sheriff's sale, and the purchase by Bishop Wood without notice, in good faith, and for valuable consideration, are established by the verdict and the record proofs. All the elements of fact are here that are necessary to support a final judgment. To send it back to the court below to secure to admitted facts the application of a series of principles differing more in order and statement than in effect and force from those applied on the former trial, merely in order to produce a second verdict identical with the first, would seem to be imposing on that tribunal functions, for the exercise of which the law holds this court responsible. *Judgment affirmed.*

WILLIAMS and MERCUR, JJ., dissented.

"We dissent on the ground that the facts on which the question of estoppel was submitted to the jury by the court below are insufficient in law to constitute an estoppel, and the facts of which the estoppel is predicated in the opinion of the majority of this court have not been passed on by the jury."